*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0040P (6th Cir.)
File Name: 00a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNIVERSITY HOSPITALS OF
CLEVELAND,
      *Plaintiff-Appellant,*

            *v.*

EMERSON ELECTRIC
COMPANY and EMERSON
ELECTRIC COMPANY BENEFIT
PLAN,
      *Defendants-Appellees.*

No. 98-4061



Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 92-01555—Paul R. Matia, Chief District Judge.

Argued: August 5, 1999

Decided and Filed: February 1, 2000

Before: NELSON and MOORE Circuit Judges;
ROSEN, District Judge.[*]

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:** Daniel W. Dreyfuss, DANIEL W. DREYFUSS CO., Cleveland, Ohio, for Appellant. Phillip J. Campanella, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellees. **ON BRIEF:** Daniel W. Dreyfuss, DANIEL W. DREYFUSS CO., Cleveland, Ohio, for Appellant. Phillip J. Campanella, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellees.

ROSEN, D. J., delivered the opinion of the court, in which MOORE, J., joined. NELSON, J. (pp. 25-29), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

ROSEN, District Judge.

## I. *INTRODUCTION*

Plaintiff/Appellant University Hospitals of Cleveland ("UHOC") appeals from the most recent award of summary judgment in favor of Defendants/Appellees Emerson Electric Company and the Emerson Electric Company Benefit Plan (collectively, the "Plan") in this action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* In the ruling now on appeal, the District Court found that the Plan's administrative review body, the Employee Benefit Committee ("EBC"), did not act arbitrarily or capriciously in denying a claim for health care benefits made by UHOC as assignee of the claims of a deceased Plan participant, Gerald Weaver. In a prior appeal, we reversed an initial award of summary judgment to the Plan, citing evidence in the record that the EBC had "erroneously relied upon a provision that was not included in

the actual Plan documents." *See University Hosps. of Cleveland v. Emerson Elec. Co. Benefit Plan*, No. 93-4924, slip op. at 4 (6th Cir. Dec. 22, 1994). Accordingly, we ordered the matter remanded to the EBC with instructions to reconsider UHOC's claim in light of "the actual Plan provisions applicable to such claim." *Id.*

On remand, the EBC once again denied UHOC's claim, and the District Court again affirmed that decision under the "arbitrary and capricious" standard of review. UHOC now raises four arguments on appeal: (1) that the District Court erred in ruling that the EBC's decision on remand was exempt from the time limits set forth in the Plan for acting upon requests for review of claim denials; (2) that the lower court improperly disregarded the "law of the case," as purportedly established in our earlier decision, regarding the applicability of the Plan's time limits on remand to the EBC; (3) that the EBC's decision on remand was tainted by the same error that led us to reverse and remand in the initial appeal; and (4) that the EBC acted arbitrarily and capriciously in denying benefits based upon a determination that the decedent, Mr. Weaver, suffered from a pre-existing condition. For the reasons stated below, we find that the EBC's decision to deny benefits was arbitrary and capricious, and we accordingly reverse the award of summary judgment to the Plan.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A.  The Parties

As we noted in our earlier decision, there is little, if any, factual dispute in this case. Plaintiff/Appellant UHOC brought this ERISA action as the assignee of Gerald Weaver, seeking to recover benefits from the Defendant/Appellee Plan for medical services rendered to Mr. Weaver before his death on June 3, 1991. The Plan's administrative review body, the EBC, has twice denied UHOC's claim for benefits, finding that the medical services at issue were not covered by the Plan because they constituted treatment for a pre-existing condition

suffered by Mr. Weaver before he became eligible for Plan benefits.

Mr. Weaver began working for Automatic Switch Company ("ASCO"), a division of Defendant/Appellee Emerson Electric Company, on September 24, 1990. He became eligible for medical benefits under the Plan on December 24, 1990, the ninetieth day of his employment. From March 27, 1991 until his death on June 3, 1991, Mr. Weaver received treatment at UHOC for myelodysplastic syndrome, a bone marrow disease. The principal dispute in this case is whether Mr. Weaver received prior treatments for this disease that would trigger the Plan's "pre-existing condition" exclusion from coverage.

## B. Mr. Weaver's 1990-91 Visits to Physicians and Medical Treatments

On September 11, 1990, shortly before he began working for ASCO, Mr. Weaver visited his physician, Dr. Unni Kumar, complaining of fatigue and stress. Dr. Kumar diagnosed Mr. Weaver as suffering from anemia, recommended a blood test, and asked Mr. Weaver to return for further evaluation. (J.A. at 468-70.) That same day, blood samples were taken from Mr. Weaver and submitted to a laboratory for analysis.

On September 28, 1990, four days after Mr. Weaver began his employment at ASCO, Mr. Weaver again visited Dr. Kumar to discuss the results of his recent blood test. Dr. Kumar advised Mr. Weaver that the serum iron, folic acid, and B-12 portions of this test were "all normal." (J.A. at 474.) Nevertheless, in light of the previous diagnosis of anemia, Dr. Kumar recommended that the blood test be repeated "before we embark on a complete hematological work-up." (*Id.*) In accordance with this recommendation, a second blood sample was taken from Mr. Weaver that day and submitted for laboratory analysis. If this second test

Given the structure of the Pre-existing Limitation provision, where "Pre-existing" has no meaning except in relation to the start of coverage and where the date used for the calculation of the first two of the three time periods mentioned is clearly the date on which the individual becomes eligible under the plan, it was not irrational for the Committee to conclude that the drafters intended the use of the same date for calculating the third time period as well. This is not the only possible construction of the provision, but it is certainly not an irrational construction.

The parties agree that there was no three-month period when Mr. Weaver was treatment-free between December 24, 1990, the date on which he became eligible for coverage, and June 3, 1991, the date on which he died. Accordingly, and because I agree with the district court that the Committee's most recent decision was rendered pursuant to the order of remand and was not subject to the contractual time limits that applied during the initial decision-making process, I would affirm the challenged judgment.

489 U.S. 101, 115 (1989), and *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

The record leaves no room for doubt as to why the Committee upheld the denial of benefits in the case at bar. As the deposition testimony of Committee Member James Draeger shows, the Committee saw no reason even to consider whether Mr. Weaver had received treatment or services during the first 90 days after September 28, 1990. The Committee upheld the denial of benefits solely on the basis of its construction of the provisions of the Plan relating to pre-existing medical conditions. And the record shows, I believe, that the Committee had a rational basis for construing the provisions in the way that it did.

Addressing the Pre-existing Limitation clause in the Schedule of Benefits, Mr. Draeger explained at page 104 of his deposition transcript that "this particular provision starts where an individual is eligible for the plan . . . ." (Mr. Weaver became eligible on December 24, 1990.) The exclusion for medical expenses incurred in connection with certain pre-existing conditions, Mr. Draeger went on to explain, continues "for a period of one year." Draeger Depo. Trans. at 104-105. Once eligibility starts, in other words,

> "[the exclusion] is going to go for one year from that date. Or it is going to go . . . from that date for three months.

Q    From which date?

A    We are talking about an individual becoming eligible under the plan, so now the individual is eligible. So now we are talking about one date [*i.e.*, one year] from the date of eligibility, or if the individual has been free of treatment at any three-month period during that particular one year period of time, whichever fi[r]st occurs." *Id.* at 105.

proved abnormal, Dr. Kumar "plan[ned] to refer [Mr. Weaver] to a hematologist." (*Id.*)

This September 28, 1990 test revealed a number of results outside the normal range, including low red blood cell and platelet counts, low hemoglobin and hematoocrit values, and elevated MCV and MCH levels. (J.A. at 473.) Accordingly, on October 8, 1990, Dr. Kumar called Mr. Weaver and advised him to see a hematologist. (J.A. at 470.) Although there are two subsequent entries in Dr. Kumar's records for the month of October — the first dated October 12, 1990, scheduling Mr. Weaver for an additional blood test, and the second dated October 26, 1990, reflecting Mr. Weaver's refusal to submit to this additional test, (J.A. at 475) — Mr. Weaver declined any further treatment in October, citing a lack of insurance coverage that would pay for a pre-existing condition. (*Id.*)

Instead, Mr. Weaver elected to wait until January 8, 1991 — two weeks after his Plan eligibility date of December 24, 1990 — to visit a hematology specialist as recommended by Dr. Kumar. The examining physician, Dr. Jon Reisman, diagnosed Mr. Weaver as suffering from mild anemia and moderately severe thrombocytopenia. (J.A. at 674.) Over the course of the next several days, Mr. Weaver underwent a number of procedures, including additional blood and bone marrow tests, a chest x-ray, and a CT scan of his abdomen. These procedures were intended, at least in part, to rule out a diagnosis of myelodysplastic syndrome. (J.A. at 476.) When the results proved inconclusive, Dr. Reisman referred Mr. Weaver to Dr. James Weick at the Cleveland Clinic for further evaluation. (J.A. at 671.)

Beginning on February 8, 1991 and continuing until his death four months later, Mr. Weaver received a variety of medical services and treatments at the Cleveland Clinic, UHOC, and elsewhere. His treatments at UHOC commenced on March 27, 1991, and resulted in total billings for medical services in the amount of $233,829.75. Mr. Weaver

ultimately was diagnosed as suffering from myelodysplastic syndrome, a bone marrow disease in which defective stem cells proliferate to the exclusion of normal cells. This disease evolved to acute leukemia, and led to Mr. Weaver's death on June 3, 1991 from kidney and heart failure. (J.A. at 536-37.)

## C.   The Relevant Plan Provisions

This case turns upon the EBC's determination that all of the medical expenses incurred by Mr. Weaver at UHOC derived from treatments for a "pre-existing condition" as defined in the Plan document, and therefore are not "covered medical expenses" under the Plan. This determination rests upon the following Plan provision, entitled "Pre-Existing Condition Limits":

> Hospital expenses and other medical expenses incurred in connection with a disease or injury for which a covered individual received treatment or services or took prescribed drugs during the three month period immediately preceding the effective date of such individual's coverage under this Plan will not be included as covered medical expenses prior to the earliest of the dates shown in the Schedule of Benefits.

(Plan, § 4, ¶ 1.84, J.A. at 609.) The Plan's Schedule of Benefits, in turn, sets forth the terms under which a participant may obtain coverage for a pre-existing condition:

> No benefits are payable for a pre-existing illness or injury for which an individual was treated or took prescribed medicine within 3 months prior to coverage until:
>
> 1) the individual has been covered under this Plan for one year, or
>
> 2) the individual has been free of treatment for the pre-existing illness or injury for 3 months.

> 2) the individual has been free of treatment for the pre-existing illness or injury for 3 months."

As written, the second clause is open to conflicting interpretations. It is possible that the drafters intended to provide that the one-year-of-coverage requirement would be overridden upon the expiration of three treatment-free months commencing with the last treatment. Had this been their intent, the drafters could have said so explicitly. They could have said, for example, that the year-of-coverage requirement would be overridden once the individual had gone without treatment for three months "from the date of the last treatment." Unfortunately, the quoted words were not included in the Pre-existing Limitation provision.

It is also possible – and perhaps more likely – that the drafters intended to provide that the year-of-coverage requirement would be overridden once the individual had been free of treatment for three months during that first year of coverage. Unfortunately, however, the drafters did not explicitly say this either. Through inadvertence, no doubt, they left their intention ambiguous.

Such ambiguities are almost certain to creep into a document as complex as this one. The drafters could, of course, have left the resolution of these inevitable ambiguities to the courts. But they chose not to. Instead, the drafters provided that a five-member Employee Benefit Committee appointed by the Emerson Electric Company's Board of Directors should have "discretionary authority to determine eligibility for benefits or to construe the terms of the Plan . . . ." And they further provided that unless the Committee's construction of the Plan's terms should be "arbitrary and capricious" – *i.e.*, simply irrational – the Committee's decision "shall be final and non-reviewable . . . ." In the face of such language, it is clear that the courts have no authority to second-guess the Committee unless the Committee has acted irrationally. See *Firestone Tire & Rubber Co. v. Bruch*,

has not been briefed and argued, however, and I have conducted no independent research on the matter. I dissent here not because of what was said by the original panel (a panel of which I was a member, incidentally), but because I remain of the opinion that it was not irrational for the Committee to construe the terms of the Plan as meaning that no benefits would be payable in connection with Mr. Weaver's pre-existing illness during the first year of coverage unless and until there had been three months of coverage in which Mr. Weaver had been free of treatment for the illness.

I acknowledge that the language of the Plan is not as clear as it might be. The Plan's Benefit Provisions start off plainly enough by establishing certain "Pre-Existing Condition Limits" once coverage commences:

> "Hospital expenses and other medical expenses incurred in connection with a disease or injury for which a covered individual received treatment or services or took prescribed drugs during the three month period immediately preceding the effective date of such individual's coverage under this Plan will not be included as covered medical expenses prior to the earliest of the dates shown in the Schedule of Benefits."

Under the catchline "Pre-existing Limitation" (a reference, obviously, to the limits pertaining to medical conditions that were "pre-existing" as of the commencement of coverage), the Plan's Schedule of Benefits – speaking as of the commencement of coverage, in the Committee's undertaking – then says this:

> "No benefits are payable for a pre-existing illness or injury for which an individual was treated or took prescribed medicine within 3 months prior to coverage until:
>
> 1) the individual has been covered under this Plan for one year, or

(Plan, § 7, at 3, J.A. at 625.)

The Summary Plan Description ("SPD") includes similar language, in a section entitled "Expenses Not Covered":

> No medical benefits will be paid for the following:
>
> • A pre-existing illness or injury for which you were treated or took prescribed medicines within 3 months before your coverage began until:
>
> — you have been covered under this Plan for a year, or
>
> — you haven't had any charges for this illness or injury for 3 months,
>
> whichever comes first . . . .

(SPD at 12, J.A. at 157.)

## D.  Procedural Background

This case has a lengthy procedural history. In May of 1991, shortly before his death, Mr. Weaver sought reimbursement from the Plan for a portion of the medical expenses he incurred at UHOC and elsewhere. On May 29, 1991, the Plan's third-party administrator, Pension Associates Incorporated ("PAI"), denied this claim for benefits, stating that "[n]o benefits are payable for a condition for which you received diagnosis, were treated or took prescribed medicines within 3 months before [the] effective date" of Plan coverage. (J.A. at 224.)[1] On August 15, 1991, PAI reiterated this position upon being presented with a request for

---

[1]As we observed in UHOC's prior appeal to this Court, PAI's reference to a condition "for which you received diagnosis" does not comport with either the Plan or the SPD, both of which speak only of receiving treatment or taking prescribed drugs.

reimbursement of additional medical expenses incurred by Mr. Weaver before his death.  (J.A. at 355.)

On November 11, 1991, the executor of Mr. Weaver's estate, Clark Weaver, assigned to UHOC "all benefits in the form of health insurance or similar benefits under an employer-sponsored health and welfare fund which Gerald Weaver (deceased) had at the time of his treatment at [UHOC], not to exceed the hospital/physician charges." (J.A. at 28.)  At about the same time, Clark Weaver appealed the denial of benefits to the Plan's administrative review body, the EBC, asserting that Mr. Weaver "had never been diagnosed nor had he ever been treated for any condition" prior to the date of Plan coverage.  (J.A. at 364.)  On April 10, 1992, the EBC denied this appeal, quoting the above-cited Plan language regarding pre-existing conditions, and stating that "based upon the information which was reviewed by two medical consultants, it is the Committee's decision that [Mr. Weaver's] illness was pre-existing and, as such, the charges have been correctly denied." (J.A. at 225.)

UHOC then brought this action on July 1, 1992, seeking reversal of the EBC's decision to deny benefits.  On October 29, 1993, the District Court granted the Plan's motion for summary judgment.  In so ruling, the Court found that Mr. Weaver's September 28, 1990 visit to Dr. Kumar triggered the Plan's "pre-existing condition" exclusion, because it occurred less than three months before Mr. Weaver became eligible for Plan coverage on December 24, 1990.  The Court next held that the EBC had reasonably construed the Plan's Schedule of Benefits as requiring that a participant go without treatment of a pre-existing condition for three months *after* his Plan eligibility date — as opposed to *any* three-month period, before or after the eligibility date, as UHOC contended — in order to qualify for coverage of further medical expenses incurred in connection with a pre-existing condition.  Because Mr. Weaver had visited a physician on January 8, 1991, just two weeks after his eligibility date, the

_____

### DISSENT
_____

DAVID A. NELSON, Circuit Judge, dissenting.  I agree with my colleagues on the panel that the Employee Benefit Committee did not act irrationally in determining that Mr. Weaver received "treatment or services" when he saw Dr. Kumar on September 28, 1990.  I also agree that the Committee did not act irrationally in determining that the hospital and medical expenses incurred after the commencement of coverage were incurred in connection with the same pre-existing disease for which Mr. Weaver received treatment or services on September 28.  I cannot agree, however, that the Committee acted irrationally in determining that Mr. Weaver failed to come within the three-months-without-treatment exception to the provision under which the payment of benefits for such a pre-existing disease is barred until there has been a full year of coverage.

If the Committee was irrational in finding this exception inapplicable, then a unanimous three-judge panel of this court must have been equally irrational when, speaking for the court when the case was here earlier, the panel quoted the pertinent sections of the Plan in their entirety and went on to note that *neither* exception to the preclusion of benefits for certain pre-existing conditions  – neither the one-year-of-coverage provision nor the three-months-without-treatment provision – had been satisfied in the matter at hand.  See *University Hospital of Cleveland v. Emerson Electric Co. Benefit Plan*, No. 93-4924, slip op. at 3 n.1 (6th Cir. Dec. 22, 1994) ("It should be noted that neither exception (1) nor exception (2) applies to the matter at hand").

I should have thought, at first blush, that this court's 1994 opinion might well have established the law of the case with respect to the issue on which the current panel rests its decision.  The applicability of the law-of-the-case doctrine

it be remanded to the EBC for further proceedings in accordance with our ruling.[13]

## IV. *CONCLUSION*

For the foregoing reasons, we REVERSE the judgment of the court below and REMAND this matter to the District Court, with instructions that UHOC's claim be remanded to the EBC for further proceedings consistent with this decision.

---

[13]Because the EBC determined that the expenses incurred at UHOC were wholly excluded from coverage as relating to a "pre-existing condition," it appears that neither the third-party administrator nor the EBC considered whether the particular expenses claimed by UHOC were covered by the Plan, subject to a deductible, or the like. Thus, we cannot order an award of benefits, but must order the matter remanded to the EBC, with the understanding that further proceedings must be confined to addressing the specific expenses contained in UHOC's claim.

Court upheld the EBC's determination that his subsequent medical expenses were not covered under the Plan.

UHOC appealed to this Court, and we reversed. In our December 22, 1994 Opinion, we held that the EBC's determination could not be sustained, in light of the evidence in the record that the EBC had considered a definition of "pre-existing condition" that could not be found either in the Plan or in the SPD. Accordingly, we ordered the matter remanded to the EBC with instructions to review UHOC's claim "under the terms of the actual Plan provisions applicable to such claim." *University Hosps. of Cleveland v. Emerson Elec. Co. Benefit Plan*, No. 93-4924, slip op. at 4 (6th Cir. Dec. 22, 1994).

On remand, the EBC again concluded, in a decision dated June 7, 1995, that UHOC was not entitled to an award of benefits:

> After a thorough reconsideration and review, the Employee Benefit Committee voted unanimously to deny the appeal of the University Hospitals of Cleveland. The Employee Benefit Committee concluded that the expert testimony establishes that Gerald Weaver had a disease for which he received treatment or services during the three month period immediately preceding the effective date of his coverage under the Plan.

> In addition, the evidence establishes that Mr. Weaver was not covered by the Plan for one year, and the evidence further establishes that Mr. Weaver had not been free of treatment for the pre-existing condition for the three month period as required by the terms of the Plan. This decision is consistent with past interpretations of the applicable Plan provisions.

(J.A. at 767-68.)

Following this second EBC determination, the District Court issued an Opinion and Order on January 17, 1997,

restoring the case to its active docket, and setting a briefing schedule for cross-motions for summary judgment. The parties filed their cross-motions and, by Opinion and Order dated August 6, 1998, the Court granted the Plan's motion and denied UHOC's motion. In this decision, as in its 1993 ruling, the District Court found that the EBC's denial of benefits was not arbitrary and capricious. The Court also rejected UHOC's argument that the EBC failed to timely issue its latest decision in accordance with the relevant Plan provision governing appeals of claim denials. UHOC now appeals this latest award of summary judgment to the Plan.[2]

## III. *ANALYSIS*

### A. The Standards Governing Review of the Challenged Denial of Benefits

A participant or beneficiary of an ERISA plan — or, as in this case, an assignee of the rights held by a plan participant — may bring suit in federal district court to recover benefits allegedly due under the terms of the plan. *See* 29 U.S.C. § 1132(a)(1)(B). It is by now well-established that courts review such challenges to benefit determinations under the *de novo* standard, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See*

---

[2]We recently held in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617-19 (6th Cir. 1998), that summary judgment generally is an inappropriate mechanism for adjudicating ERISA claims for benefits. The District Court did not have the benefit of this decision, issued just a few days before the ruling now on appeal. In any event, as we explained in *Wilkins*, such reliance on summary judgment standards does not warrant reversal, so long as the District Court's review of the challenged benefit decision is confined to the evidence contained in the administrative record. 150 F.3d at 620. The lower court's decision in this case appears to satisfy this standard. Likewise, in our review of the District Court's ruling, we will consider only the materials available to the EBC, and not any depositions, affidavits, or similar litigation-related materials that the parties submitted to the District Court.

thereby satisfied the Plan's requirement for coverage of a pre-existing condition. Thus, having surveyed all of the possible bases for the EBC's determination to the contrary, and finding each of them lacking in reasoned justification, we conclude that the EBC's decision to deny UHOC's claim was arbitrary and capricious.

In so holding, we cannot be blind to the totality of the circumstances surrounding Mr. Weaver's medical treatment. According to Dr. Kumar's medical records, Mr. Weaver affirmatively cited the "pre-existing condition" limitation on his health care coverage when he refused further treatment in October of 1990. The Plan suggests that this was opportunistic behavior, and urges us to reject "the notion that a person can deliberately and intentionally ignore a recommended course of care in order to create the illusion of the absence of treatment for an existing disease." (Defendants/Appellees' Appeal Br. at 30.) Yet, we discern no "illusion" here, nor any unfairness in the result. Rather, Mr. Weaver's conduct was the entirely foreseeable and reasonable product of Plan language that created an incentive to forego treatment of a pre-existing condition. If the Plan wishes to curtail "deliberate and intentional" elections by its participants to "ignore" recommended courses of treatment, then the Plan should be amended so as not to encourage such behavior.

As the Plan is now written, however, such conduct is rewarded, and we see no reason to penalize Mr. Weaver for conforming his health care decisions to a reasonable — indeed, in our view, the *only* reasonable — construction of the Plan. Accordingly, we find that the EBC's denial of UHOC's claim for benefits was arbitrary and capricious, we reverse the judgment of the court below upholding this denial, and we remand this matter to the District Court with instructions that

be termed "treatment" was administered or received on October 8. *See* American Heritage College Dictionary 1440 (3d ed. 1993) (defining "treatment" as "[a]dministration or application of remedies to a patient or for a disease or an injury," or "[t]he substance or remedy so applied"). Rather, the treatment was received on September 28, and the doctor/patient contact on October 8 merely followed up on this prior treatment, reporting its outcome and recommending further treatment.[12] We do not believe that a mere recommendation constitutes treatment, particularly where, as here, the patient declines to adopt the recommended course of care.

The Plan's suggestion that the October 8 contact was part of an ongoing "treatment" is all the more untenable when considered in light of the SPD, which effectively equates "treatment" with "charges." The record does not indicate that Mr. Weaver incurred any charges based on Dr. Kumar's October 8 telephone call, and one would not expect that such a physician contact following an office visit would result in a separate charge. Because we must give controlling effect to the language of the SPD, it is not enough that the October 8 contact might constitute "treatment" under some conceivable definition of that term, if Mr. Weaver incurred no charges that day.

In any event, even if the October 8 contact could be viewed as "treatment" under the Plan and its SPD, Mr. Weaver waited three full months, until January 8, 1991, before seeking any further treatment of his condition. Under the plain language of the Plan, then, Mr. Weaver remained "free of treatment for the pre-existing illness or injury for three months," between October 8, 1990 and January 8, 1991, and

---

[12]Tellingly, in an August 20, 1991 letter clarifying "the status of Mr. Gerald Weaver and the contact he has had with our office," Dr. Kumar did not even mention any contacts with Mr. Weaver in October of 1990, but instead concluded his summary with the September 28, 1990 office visit. (J.A. at 367.)

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989); *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). In this latter case, the administrator's benefit determination is reviewed under an "arbitrary and capricious" standard. *Firestone*, 489 U.S. at 115, 109 S. Ct. at 956-57; *Smith*, 129 F.3d at 863.

The Plan in this case provides that the EBC "shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan," (Plan, § 6, Blanket Amendment, J.A. at 629), and further provides:

> The Employee Benefit Committee, as outlined in Section One (2.), is empowered to review requests for review of denied claims submitted in writing by any participant. The Plan gives the Employee Benefit Committee the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan in carrying out the duties outlined in this Section [*i.e.,* Section 5] and Section One (2.). The decision of the Review Board shall be final and non-reviewable unless found to be arbitrary and capricious by a court of competent review.

(*Id.*) As the parties apparently agree, this language constitutes a sufficient grant of discretionary authority to trigger application of the "arbitrary and capricious" standard of review. *See, e.g., Bagsby v. Central States, Southeast & Southwest Areas Pension Fund*, 162 F.3d 424, 428 (6th Cir. 1998); *Smith*, 129 F.3d at 863.[3]

---

[3]While conceding that this Plan language, viewed in isolation, dictates application of the deferential "arbitrary and capricious" standard, UHOC argues that the *de novo* standard should apply here by virtue of the EBC's alleged failure to timely issue a decision following our prior remand of this matter to that body for reconsideration. As UHOC points out, if a plan administrator fails to timely decide an appeal of a claim denial, the challenged claim "shall be deemed denied on review," 29 C.F.R. § 2560.503-1(h)(4), and the claimant may then "bring a civil action to have the merits of his application determined, just as he may bring an

Under this deferential "arbitrary and capricious" standard, we will uphold a benefit determination if it is "rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (internal quotations and citation omitted). Stated differently, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citation omitted), *cert. denied*, 495 U.S. 905 (1990).

We note, however, that our deferential review of the benefit denial at issue here is tempered by two principles. First, as UHOC argued in the early stages of this litigation before the District Court, we should not overlook the fact that the Plan is funded largely by Defendant/Appellee Emerson Electric, and that the EBC is appointed by Emerson's Board of Directors. The "possible conflict of interest" inherent in this situation "should be taken into account as a factor in determining whether the [EBC's] decision was arbitrary and capricious." *Davis*, 887 F.2d at 694; *see also Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir.

_____

action to challenge an outright denial of benefits." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144, 105 S. Ct. 3085, 3091 (1985). Although neither the regulation nor *Russell* addresses the applicable standard of review in such circumstances, there is undeniable logic in the view that a plan administrator should forfeit deferential review by failing to exercise its discretion in a timely manner. *But see Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988) (stating that "the standard of review is no different whether the appeal is actually denied or is deemed denied"), *cert. denied*, 488 U.S. 826 (1988). In any event, given our ruling on the merits of the EBC's denial of benefits, we need not decide whether the EBC timely issued its decision on remand, nor whether any failure to timely decide UHOC's appeal should trigger a less deferential standard of review.

condition. Although this phrase is not further defined in the Plan, the Summary Plan Description ("SPD") restates the Plan's three-month treatment-free provision as requiring that "you haven't had **any charges** for this illness or injury for 3 months." (SPD at 12, J.A. at 157 (emphasis added).) Because employees rely on summary descriptions "for information which will allow them to make intelligent decisions about their future benefit needs," we have held that the language of the SPD controls over any conflicting language in the Plan itself. *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 247-48 (6th Cir. 1996), *cert. denied*, 519 U.S. 1059 (1997). Accordingly, in considering the Plan's contention that Mr. Weaver was not "free of treatment" in October of 1990, we must be mindful of the SPD's linkage between "treatment" and "charges."

Viewed in this context, it is clear that nothing in Mr. Weaver's medical history for October of 1990 could reasonably be considered "treatment." First, the cursory entry for October 12 does not establish any contact whatsoever between Mr. Weaver and his physician, much less the "treatment" required under the terms of the Plan. Next, the October 26 entry not only fails to reflect any treatment received by Mr. Weaver, but affirmatively shows his *refusal* of treatment. Plainly, such a refusal cannot be equated with treatment, as it is the very antithesis of treatment. And, the record is devoid of any evidence that Mr. Weaver incurred charges relating to these October 12 and October 26 entries in his medical history.

Turning, finally, to the October 8 contact between Dr. Kumar and Mr. Weaver, the Plan asserts that it is reasonable to view this as a continuation of the September 28 office visit, in which Dr. Kumar reported the results of the tests administered during the office visit and recommended a further course of action. Yet, the Plan itself is clear in stating that only *treatment* is relevant, and not, for example, the mere "services" that are sufficient to initially trigger the exclusion for pre-existing conditions. Simply stated, nothing that could

without "treatment" for this condition, whether before or after his Plan eligibility date. The parties agree that Mr. Weaver did not seek treatment in November or December of 1990, and that his treatment resumed on January 8, 1991. The dispositive question, therefore, is whether Mr. Weaver was "free of treatment" during all or most of October, 1990, so that there was a three-month period before January 8, 1991 in which he received no treatment for his condition.

Dr. Kumar's medical history for Mr. Weaver includes three entries for October of 1990. First, on October 8, 1990, Dr. Kumar called Mr. Weaver to inform him of the results of his recent blood test and recommend that he see a hematologist. (J.A. at 470.) Next, there is a short entry for October 12, 1990, stating only "CBC," which apparently reflects an attempt to schedule an additional blood test.[10] (J.A. at 475.) Finally, an entry dated October 26, 1990 indicates that Mr. Weaver refused a blood test, stating that his health insurance would not cover a pre-existing condition. (*Id.*) The Plan argues that these October entries reflect a "continuing" course of treatment which began with Mr. Weaver's September 28 office visit. (Defendants/Appellees' Appeal Br. at 27.)[11]

We cannot accept this as a reasonable characterization of Mr. Weaver's medical history. We begin by observing that the Plan itself offers considerable guidance in determining what it means to be "free of treatment" for a pre-existing

---

[10] The record does not indicate whether this blood test was to occur on October 12 or some other date, nor whether Mr. Weaver was contacted in regard to this matter. In any event, it appears that Dr. Kumar's office did not administer any blood tests in October.

[11] We note that there is nothing in the administrative record to indicate that the EBC ever made such a finding of a "continuing course of treatment" extending into October of 1990. Nevertheless, in the interest of resolving this nearly eight-year-old litigation, we will address this argument as a possible alternate ground for sustaining the EBC's decision.

1998).[4]　Next, to the extent that the Plan's language is susceptible of more than one interpretation, we will apply the "rule of *contra proferentum*" and construe any ambiguities against Defendants/Appellees as the drafting parties. *Perez v. Aetna Life Ins. Co.*, 150 F.3d, 550, 557 n. 7 (6th Cir. 1998).

### B. The EBC's Interpretation of the Plan as Not Covering the Medical Expenses Mr. Weaver Incurred at UHOC Is Arbitrary and Capricious.

As indicated by the above-quoted Plan provisions relating to pre-existing conditions, the EBC's consideration of UHOC's claim for benefits involved a two-step inquiry. First, under the Plan's definition of a "pre-existing condition," the EBC had to determine whether Mr. Weaver's medical expenses at UHOC were "incurred in connection with a disease or injury for which [Mr. Weaver] received treatment or services or took prescribed drugs during the three month period immediately preceding" Mr. Weaver's Plan eligibility date of December 24, 1990. If so — in other words, if Mr. Weaver's medical expenses were traceable to a "pre-existing condition" — the EBC then would have to consider whether Mr. Weaver satisfied either of the two conditions under which the Plan would commence to pay expenses relating to this

---

[4] In its initial decision granting summary judgment to the Plan, the District Court rejected UHOC's claim of a conflict of interest, reasoning that "[t]he Plan is clearly a separate and distinct entity requiring fiduciary duties under ERISA." (District Court's 10/29/93 Op. at 4, J.A. at 680.) Because we found a different defect in the EBC's decisional process, we did not reach this issue in the initial appeal, and UHOC has not raised it in the present appeal. Nevertheless, we believe it appropriate to observe here that the mere existence of fiduciary duties, which always are present in any benefit determination governed by ERISA, does not obviate the need to more carefully examine decisions that might be tainted by a conflict of interest. Courts should be particularly vigilant in situations where, as here, the plan sponsor bears all or most of the risk of paying claims, and also appoints the body designated as the final arbiter of such claims. Under these circumstances, the potential for self-interested decision-making is evident.

"pre-existing condition": namely, either (1) that Mr. Weaver was "covered under this Plan for one year," or (2) that he had been "free of treatment for the pre-existing illness or injury for 3 months." Upon carrying out this two-step inquiry, the EBC concluded that Mr. Weaver's UHOC expenses were traceable to a pre-existing condition, but that he had not satisfied either of the two conditions for coverage of this pre-existing condition by the time he was treated at UHOC. UHOC now challenges both of these conclusions.

As for the first step of the inquiry — namely, whether Mr. Weaver triggered the "pre-existing condition" exclusion by receiving "treatment or services" within three months prior to his Plan eligibility date of December 24, 1990 — we find that the EBC's determination was reasonable in light of the available evidence. It is undisputed that Mr. Weaver visited his physician, Dr. Kumar, on September 28, 1990, and that he provided a blood sample for testing that day. Plainly, then, Mr. Weaver received medical treatment or services within the three-month period prior to December 24, 1990.

UHOC, however, challenges the EBC's finding that the condition for which Mr. Weaver received treatment on September 28, 1990, was the same "pre-existing condition" for which he subsequently received treatment at UHOC in March through June of 1991. In reaching this conclusion, the EBC obtained and considered two separate and independent medical opinions, both of which indicated that the condition diagnosed in early 1991 was a continuation of the condition for which Mr. Weaver sought treatment in September of 1990. (J.A. at 543-44.) In addition, in its review upon remand, the EBC heard a presentation from UHOC's counsel, and was provided an opinion from UHOC's medical expert, Dr. Lawrence Kass, stating that it was "uncertain" whether the anemia diagnosed by Dr. Kumar in September of 1990 "eventually evolved" into myelodysplasia, and that it would be "only speculative" to so conclude. (J.A. at 391.)

Given all these express references to the date a participant's coverage commences, we cannot help but place significance on the *absence* of any such language in the three-month treatment-free provision at issue here. If we were to view the Plan as "impliedly" including the additional qualification imposed by the EBC, we would sanction an inconsistent reading and permit the Plan to have it both ways. Under the EBC's interpretation, a Plan participant triggers the "pre-existing condition" exclusion by accepting any treatment or services at *any time* within the three months prior to his Plan coverage date. Yet, in the EBC's view, no significance attaches to any decision by a Plan participant to *forego* treatment during this same three-month period; such decisions, we are told, count only if made *after* the Plan coverage date.

We cannot accept this attempt to impose an additional and one-sided limitation not stated in the Plan itself. This is particularly so where, as we have noted, the Plan is largely funded by Defendant/Appellee Emerson Electric and the EBC is appointed by Emerson's Board of Directors, so that the EBC has an evident self-interest in seeing that UHOC's rather sizable claim is not paid.[9] Moreover, the rule of *contra proferentum* precludes the EBC from finding an "ambiguity" in the Plan's three-month treatment-free provision, and then invoking its discretionary power to "construe" this provision in the Plan's favor. There is no ambiguity here: the provision in question includes no limitation beyond the requirement of three months without treatment.

This leads us to the second suggested basis for the EBC's decision: that, following his visit to Dr. Kumar in late September of 1990 which triggered the "pre-existing condition" exclusion, Mr. Weaver *never* went three months

---

[9]Although Plan participants are required to pay certain deductibles and co-pays, there is nothing in the record to indicate that any such participant contributions would significantly reduce the burden on the Plan if it were determined that the Plan must pay UHOC's claim.

coverage of expenses incurred in connection with a pre-existing condition, a participant must be "free of treatment for the pre-existing illness or injury for 3 months." On its face, this language is satisfied by *any* three-month period without treatment, whether it falls entirely *after* the Plan eligibility date or extends into the 90-day period *before* an employee is covered by the Plan.[8] It is not a permissible act of "construction" to augment this language with the additional qualifier that a participant must be "free of treatment . . . for 3 months **after the effective date of Plan coverage**." Rather, the terms of the Plan must be construed "according to their plain meaning, in an ordinary and popular sense," *Perez*, 150 F.3d at 556, and those terms simply do not impose the requirement that a participant not seek treatment for three months *after* he is covered by the Plan.

The implausibility of the EBC's interpretation is amply illustrated through comparison with other Plan language, also relating to "pre-existing conditions," that *does* compute time periods by reference to a participant's date of coverage. For example, the Plan defines a "pre-existing condition" as one "for which a covered individual received treatment or services or took prescribed drugs during the three month period **immediately preceding the effective date of such individual's coverage under this Plan**." (J.A. at 609 (emphasis added).) The Plan further provides that coverage of a pre-existing condition will commence once the participant "**has been covered under this Plan for one year**." (J.A. at 625 (emphasis added).) Similarly, the SPD states that a pre-existing condition is one "for which you were treated or took prescribed medicines within 3 months **before your coverage began**," and that medical expenses will be paid for such a condition once "you have been **covered under this Plan** for a year." (J.A. at 157 (emphasis added).)

---

[8]Likewise, the SPD requires only that "you haven't had any charges for this illness or injury for 3 months," and does not further specify that this three-month period must follow the date of Plan coverage.

Given this range of medical opinions and evidence before the EBC, we cannot say that its determination on this point was arbitrary and capricious. In particular, where the EBC's decision enjoys the support of two independent medical opinions, it is sufficiently grounded in reason and evidence to satisfy the "least demanding form of judicial review," the arbitrary and capricious standard. *Davis*, 887 F.2d at 693 (internal quotations and citation omitted). Although UHOC's medical expert reached a different conclusion, complete consensus is not required to establish a reasoned basis for an administrative decision. Indeed, even UHOC's expert was unwilling to say that the anemia suffered by Mr. Weaver in September of 1990 was altogether unrelated to the myelodysplastic syndrome that ultimately led to his death; he stated only that any such connection was "uncertain" and "speculative." The EBC could rationally have elected instead to heed the opinions of two other experts, both of whom viewed the evidence in Mr. Weaver's medical history as sufficient to make this connection.[5]

The next step in the EBC's inquiry, however, is more problematic. All are agreed that Mr. Weaver was not covered under the Plan for a year prior to his treatment at UHOC, so that he did not satisfy the first of the two conditions for Plan coverage of a pre-existing disease. The EBC also found that

---

[5]UHOC argues that these expert opinions necessarily are "tainted" by our ruling in the prior appeal that the EBC's initial decision might have rested upon a definition of "pre-existing condition" not found in the Plan or the SPD. As the District Court observed in rejecting this argument, however, these medical opinions do not turn on matters of Plan interpretation or any particular definition of "pre-existing condition," but instead are based upon analysis of Mr. Weaver's medical history to see whether his treatments before and after December 24, 1990 were directed at the same or different medical conditions. Once the medical experts weighed in on this issue, it was left to the EBC to decide whether Mr. Weaver's particular interactions with medical personnel in the three months before December 24, 1990 constituted "receiv[ing] treatment or services or t[aking] prescribed drugs" within the meaning of the Plan's definition of a "pre-existing condition."

Mr. Weaver did not satisfy the second condition, stating in its June 7, 1995 decision that "the evidence further establishes that Mr. Weaver had not been free of treatment for the pre-existing condition for the three month period as required by the terms of the Plan." (J.A. at 768.) We find insufficient support in the record to sustain this determination, even under the deferential "arbitrary and capricious" standard of review.[6]

While the EBC's decision is stated in somewhat conclusory fashion, the Plan suggests two possible rationales for this decision, and argues that either is adequate to sustain it. First, we are told that the EBC "construed the Plan as requiring participants with a pre-existing disease to be free of treatment for a three month period **after the effective date of coverage by the Plan** in order to receive benefits for the pre-existing disease." (Defendants/Appellees' Appeal Br. at 25-26 (emphasis added).)[7] Given the EBC's discretionary authority

---

[6]As Judge Nelson notes in his dissent, our decision in the prior appeal of this case included a footnote tersely stating, without discussion, that the Plan's three-month treatment-free provision did not "appl[y] to the matter at hand." *University Hosps. of Cleveland v. Emerson Elec. Co. Benefit Plan*, No. 93-4924, slip op. at 3 n.1 (6th Cir. Dec. 22, 1994). Notably, in the present appeal, the Plan does not even mention this earlier statement, much less argue that we have already ruled upon the applicability of the three-month treatment-free provision. Similarly, while Judge Nelson quotes this footnote, he elects not to rely on the "law of the case" doctrine in his dissent. Having considered the matter, we do not believe that this statement represents the "law of the case," where our earlier ruling did not address the merits of or reasoning behind the EBC's initial denial of benefits, but instead rested on the limited ground that the EBC might have erroneously relied on language not found in the Plan itself. As we have observed, the "law of the case" doctrine is "limited to those questions necessarily decided in the earlier appeal." *Hanover Ins. Co. v. American Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997).

[7]The dissent sees "no room for doubt" that this construction was the one adopted by the EBC in denying UHOC's claim. This conclusion is based on the deposition testimony of one EBC member, James Draeger; the EBC's written decision includes no such statement of its reasoning. Our decision in *Wilkins*, *supra*, 150 F.3d at 618, however, precludes us

---

in matters of Plan interpretation, the Plan argues that we must defer to this construction of the three-month treatment-free requirement. If this proposed construction is accepted, it follows that the EBC properly denied UHOC's claim, as it is undisputed that Mr. Weaver sought treatment within two weeks after he became eligible for Plan benefits.

Upon reviewing the plain language of the Plan, however, we find that the EBC has exceeded its power to *interpret* the Plan, and instead has effectively *rewritten* it. To trigger

---

from considering evidence, such as Draeger's testimony, that is not part of the administrative record.

Indeed, we should be all the more reluctant to stray from the administrative record where, as here, the proffered evidence is one person's post hoc explanation of an administrative body's decision. In an analogous situation, we do not look to post-enactment statements of legislators when determining the meaning of statutes. *See Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202, 209-10 (6th Cir. 1991). More importantly, it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review. The concerns inherent in this scenario are even more pronounced where, as here, the administrator has a financial incentive to deny benefits. To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them — or, worse yet, federal judges — to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation. At a minimum, if we permit such rehabilitation of the administrative record, there no longer is any reason why we should not apply a more searching *de novo* review of the administrator's decision.

Having said this, we do not mean to imply that Mr. Draeger's testimony fails to accurately reflect the basis for the EBC's decision. The point is, we simply cannot tell from the text of the decision itself, nor from the administrative record. Ideally, that text should be the principal point of reference in our review of a challenged denial of benefits.