NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0465n.06
Filed: July 3, 2006

No. 05-1751

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RITA HANSEN,                                   )
                                               )
    Plaintiff-Appellant,                       )
                                               )
v.                                             )   ON APPEAL FROM THE UNITED
                                               )   STATES DISTRICT COURT FOR THE
METROPOLITAN LIFE INSURANCE                    )   EASTERN DISTRICT OF MICHIGAN
COMPANY and ELECTRONIC DATA                    )
SYSTEMS CORPORATION,                           )
                                               )
    Defendants-Appellees.                      )


Before: BOGGS, Chief Judge; KEITH and SUTTON, Circuit Judges.


SUTTON, Circuit Judge. Rita Hansen challenges the district court's order affirming the

Metropolitan Life Insurance Company's denial of disability benefits to her in this case brought under

the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). Because

MetLife reasonably interpreted the plan and reasonably determined that Hansen was not disabled

under the plan's terms, we affirm.


I.


Rita Hansen began working for EDS, otherwise known as Electronic Data Systems

Corporation, as an administrative assistant in 1985. She participated in a disability-benefits plan

provided by EDS and administered by MetLife. The plan defined "'Disabled' or 'Disability'" by reference to an employee's health status as well as to her earning power. JA 56. For the first 24 months of coverage, the plan entitled an employee to benefits only if, "due to sickness, pregnancy or accidental injury," she (1) was "receiving Appropriate Care and Treatment from a Doctor on a continuing basis" and (2) was "unable to earn more than 80% of [her] Predisability Earnings . . . at [her] Own Occupation for any employer in [the] Local Economy." *Id.* Coverage under the plan ended, among other times, on the date an employee was "laid-off," JA 67, though "termination of [an employee's] coverage" did not end disability benefits started before the layoff, JA 55.

In late 2001, Hansen began experiencing back pain. On February 4, 2002, Hansen's doctor diagnosed her with a herniated disc in her lower back. Based on this diagnosis, the doctor opined that Hansen was "unable to drive or assume positions for a long standing period," and would "require an in home setting work environment," JA 171. After learning of this diagnosis, EDS allowed Hansen to work from home and continued paying Hansen her full salary.

On February 28, 2002, Hansen met with a back-care specialist for an initial consultation. The specialist believed that Hansen's back problem, "despite radiological evidence of disc herniation," was "musculoskeletal (i.e., mechanical)" and therefore treatable through "a spinal rehabilitation program emphasizing stretching and strengthening." JA 139. A week later, Hansen began attending physical-therapy sessions.

On March 26, 2002, according to Hansen, EDS "asked when [she] could return to working at the office as it was causing a hardship trying to work from home." JA 193. Hansen called her doctor who faxed a note to EDS confirming that Hansen was "able to return to work . . . with restrictions . . . [of] 4 hours per day on a 2-day week period for 6 weeks." JA 285. Two days later, on March 28, Hansen returned to the office and attended a four-hour meeting, which exacerbated her back pain. A "Progress Note" taken during a physical-therapy session on April 1 noted a "transient increase in symptoms after return to work for 4 hours," JA 144, and "some subjective improvements since initiating physical therapy," JA 145.

On April 3, 2002, when Hansen arrived at work, a supervisor informed her that EDS had eliminated her position as part of a reduction in force. According to Hansen, she had "planned to sit and speak with [her supervisor that day] to inform her that due to my medical condition I was disabled and could no longer work," but she was "separated from EDS prior to having the opportunity to inform her of my disability." JA 193. According to Hansen, her supervisor "stated I should have gone on disability back in January rather than try to work." *Id.*

After the layoff, Hansen's treatment continued, apparently with some success. On April 22, 2002, the back-care specialist observed, "Overall, Ms. Hansen is doing quite well. She continues to have difficulties with prolonged sitting or standing but back pain has decreased." JA 138. On May 19, 2002, an MRI revealed that Hansen's lumbar-spine condition "is significantly improved since the prior study." JA 152.

On July 16, 2002, Hansen applied to MetLife for disability benefits, claiming she had become disabled in "late 2001," several months before the layoff. JA 287. On January 27, 2003, after an initial review and appeal, MetLife denied her claim. In doing so, it pointed to the language in the plan defining "disabled" as meaning "due to sickness, pregnancy or accidental injury, you . . . are unable to earn more than 80% of your Predisability earnings," JA 96 (ellipses in original), then reasoned that "while working at home, and up to her date of termination, Ms. Hansen was receiving 100% of her regular salary," JA 97. "Although it is not in dispute that her back condition obviously developed prior to April 4, 2002," MetLife noted, "it did not become 'disabling' as defined by her . . . plan prior to that date." *Id*. And because her layoff also ended her eligibility for benefits, MetLife concluded, "she was no longer eligible for . . . benefits for any disability commencing on or after that date." *Id*.

On June 3, 2003, Hansen filed a complaint in federal district court, alleging that MetLife wrongfully had denied her benefits. *See* 29 U.S.C. § 1132(a)(1)(B). On April 12, 2005, the district court granted MetLife's summary-judgment motion, rejecting her claim as a matter of law.

II.

Because this ERISA plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), *see* JA 80 ("[T]he Plan administrator . . . shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and

entitlement to Plan benefits . . . ."), we review MetLife's denial of benefits for an "abuse of discretion," *Firestone*, 489 U.S. at 115. And because MetLife funds and administers the plan, it operates with a potential conflict of interest, which is "a factor in determining whether there is an abuse of discretion." *Id.* (internal quotation marks and brackets omitted). "Under this deferential standard, we will uphold a benefit determination if it is rational in light of the plan's provisions." *Gismondi v. United Technologies Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (internal quotation marks omitted).

As a preliminary matter, it is worth emphasizing that it is MetLife's decision to deny Hansen benefits, not EDS's decision to lay her off, that we must consider. Hansen's complaint does not allege any impropriety in the lay-off decision, nor any connection between the decision and Hansen's condition. To our knowledge, Hansen has not filed a disability-discrimination claim against her former employer, and the propriety of her layoff at any rate is the concern of the employer, EDS, not the plan administrator, MetLife.

The benefits plan in this case awards an employee disability benefits if she "became Disabled while covered under this plan." JA 55. "'Disabled' . . . means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and . . . you are unable to earn more than 80% of your Predisability Earnings . . . at your Own Occupation for any employer in your Local Economy." JA 56. No one disputes that Hansen suffered from a medical condition or that she received treatment for her back pain. And Hansen concedes that "through her separation date . . . . she did receive 100% of her salary." JA 104. The

question under these circumstances is whether MetLife acted arbitrarily and capriciously in concluding that Hansen "earn[ed]" her salary during this period, as the plan required, JA 56, rather than receiving payment for some other reason, such as vacation or sick-leave pay, or mere charity.

Substantial evidence supports MetLife's conclusion that Hansen "earned" her salary until the April 3 layoff. For one, EDS informed MetLife that Hansen worked until the layoff. *See* JA 185 (report from EDS to MetLife: "[Hansen] was working and not on a doctor required leave at the time of her employment termination."). For another, in the early part of her rehabilitation (before the layoff and before she had received much treatment), Hansen informed her physical therapist that she was working full time from home. JA 148 (Physical therapist's assessment on March 7, 2002: "Client states . . . . she is working from home approximately 40 hours per week."). That Hansen was working full time *before* receiving treatment fairly supports MetLife's conclusion that she continued working full time *after* reaping the benefits of that treatment. Hansen later admitted that "[o]n and before April 3, 2002, [she] was an active employee, working at home and receiving full salary from EDS." JA 356. In a separate court proceeding concerning her entitlement to *short-term* disability benefits (a claim that Hansen admits "was administered and evaluated by MetLife," Hansen Br. at 31), the evidence revealed that Hansen "logged in over forty hours per week, for the eight weeks she worked at home," including the days immediately preceding the termination. D. Ct. Op. at 7–8 (June 17, 2005). Finally and significantly, the administrative record contains no evidence contradicting MetLife's conclusion that she not only received 100% of her pay through April 3 but that she also earned that money by working both from home and at the office.

Hansen challenges the rationality of MetLife's conclusion, noting that it would bar recovery to an employee who suffers a serious, disabling injury while driving to work on the day her company planned to fire her. It is by no means clear, however, that MetLife would construe the plan to bar coverage under those circumstances. What is clear is that those circumstances did not occur here. The closest Hansen comes to matching this analogy is the exacerbation of her back pain following the four-hour in-office meeting on March 28, which according to Hansen left her "totally disabled." Hansen Br. at 5. But after that meeting, according to her physical therapist, Hansen "report[ed] [a] transient increase in symptoms after return to work." JA 144. "Transient" symptoms do not establish a "total disability. *See* The Sloane-Dorland Annotated Medical-Legal Dictionary 742 (1987) (defining "transient" as "pass[ing] without doing any damage"). MetLife's conclusion that no disabling injury occurred between March 28 and April 3 is bolstered by the therapist's report, at the same April 1 session, of "subjective improvements since initiating physical therapy," JA 145, and is cemented by the medical evidence a few weeks later that Hansen was "doing quite well," JA 138, and had "significantly improved" since January, when she first received treatment, JA 152. Finally, it bears adding that when Hansen eventually filed her disability claim, she listed the "Date Disability Began" as "late 2001," JA 287, not late March or early April.

Nor does it change matters that Hansen intended to file a claim on April 3, 2002, but did not have a chance to do so before the layoff. *See, e.g.*, JA 193 ("I [Hansen] was separated from EDS prior to having the opportunity to inform [EDS] of my disability."). Even though Hansen did not file her claim until well after April 3 (indeed not until July 16), she was not prejudiced by that fact.

MetLife did not reject her claim because she *filed* it after EDS laid her off; MetLife rejected her claim because she failed to *show* she was disabled before the layoff.

Finally, Hansen points to a difference between the terms of the plan and the summary description of that plan. *Compare* Plan Terms, JA 56 (defining "disabled" as "you are unable to earn more than 80% of your Predisability Earnings") *with* Plan Summary, JA 350 (defining "disabled" as "you are diagnosed as unable to earn more than 80 percent of your pre-disability earnings"). "Because employees rely on summary descriptions for information which will allow them to make intelligent decisions about their future benefit needs, we have held that the language of the [summary] controls over any conflicting language in the Plan itself." *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 850–51 (6th Cir. 2000) (internal quotation marks omitted). Claiming that there is a difference between these definitions, Hansen argues that "the individual who was diagnosed as being unable to earn the requisite percentage of income but who decided to ignore their doctor's diagnosis would still be entitled to benefits." Hansen Br. at 19.

But even if there is a material difference between these definitions, a point we need not reach, the fact remains that the record does not support the factual premise of her argument—namely, that she was diagnosed with a condition precluding her from earning 80% of her predisability salary. Hansen did not ignore her doctor's instructions but abided by them, and even then she continued to earn 100% of her salary.

In ERISA cases, "disability" is not a term of art but one that varies from plan to plan. *See, e.g.*, *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 n.4 (6th Cir. 2005) ("[I]t would be improper for courts *automatically* to impose the same standards on a plan administrator which they impose on the [Social Security Administration], because the definitions of 'disability' employed by those decision-makers might differ."); *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 Fed App'x 734, 744 (6th Cir. 2005) (observing that "in order to be eligible for benefits," where evidence revealed that the plaintiff suffered from sleep apnea, "[the plaintiff] must show that she met the definition of disability under the plan"); *see also Kunstenaar v. Conn. Gen. Life Ins. Co.*, 902 F.2d 181, 183 (2d Cir. 1990) ("Plaintiff confuses illness with total disability. No one is disputing the fact that [the plaintiff] was ill. In fact, he may have been ill since June of 1985. However, illness is not to be equated with total disability. Defendants in reviewing [the plaintiff's] eligibility properly used the insurance company's definition of total disability as their authority."). The problem for Ms. Hansen is that she did not satisfy MetLife's reasonable interpretation of this disability-benefits plan.

III.

For these reasons, we affirm.