Chester M. STEPHENS, Jr., guardian
of Stephanie A. Stephens,
Plaintiff–Appellant,

v.

WESTINGHOUSE BENEFITS PLAN;
B.G. Clayton, as Westinghouse Benefits Plan Administrator; Westinghouse Electric Corporation, Defendants–Appellees.

No. 99–6144.

United States Court of Appeals,
Sixth Circuit.

Jan. 12, 2001.

Before JONES, BOGGS, and SILER, Circuit Judges.

PER CURIAM.

This appeal calls upon us to review an ERISA benefits plan's denial of benefits to a severely injured dependent of a Plan member. The district court affirmed the Plan's decision. Because authorized Plan officials reviewed the application for bene-

fits and did not act in an arbitrary or capricious manner in deciding to deny benefits, we affirm.

I

On October 17, 1986, at age 19, Stephanie Stephens suffered permanent injuries in an automobile accident. Devastating head trauma necessitated in-patient treatment at Western Baptist Hospital in Paducah, Ky., for 244 days. Stephanie then spent seventeen months at the Greenery, a Boston rehabilitation center specializing in brain injury cases, and approximately two-and-a-half years at the Cane Creek rehabilitation facility in Martin, Tenn. In July 1991, she began living with her parents in Paducah and has received 24–hour skilled nursing care from RN's and LPN's since returning home. Her primary treating physicians are Paducah Drs. James A. Metcalf, a neurologist, Richard D. Smith, an internist, and Robert P. Meriwether, a neurosurgeon.

Two months after Stephanie's return home, Mr. Stephens's former employer and health care benefits provider, Westinghouse, denied his claim on behalf of his eligible-dependent daughter for Westinghouse Benefits Plan coverage of the costs of 24–hour skilled care. The Plan's network claims manager considered only 6 hours per day of nursing care medically necessary. Mr. Stephens secured letters from Stephanie's physicians and proceeded with an administrative appeal. On July 1, 1992, a new claims manager, CIGNA, reversed the claim denial and approved 24–hour home private nursing benefits, retroactive to July 1991.

In early 1995, MetLife became the new network manager for health care benefits, and Mr. Stephens immediately contacted MetLife and Westinghouse's benefits division to ensure continued payment of his

claims. On March 3, 1995, MetLife notified Mr. Stephens of its intent to reevaluate the medical necessity of 24–hour nursing services. Drs. Metcalf and Smith wrote letters explaining the necessity of skilled nursing care to monitor a Gastonomy tube (G-tube), maintain a catheter, and deliver medications, although they did not specify whether skilled care was necessary 24 hours per day. Dr. Philip L. Bryson, medical director of the Medical Management Center at MetLife opined that the care being given was no longer medically necessary and had become primarily custodial, in the sense of maintaining basic life functions. MetLife asked Genex Services, Inc., to conduct a neurological evaluation of Stephanie. At Genex's request, Dr. George A. Curry, II, of the Welborn Clinic of Evansville, Ind., wrote a six-page evaluation of Stephanie, which concluded: "If the patient is to be kept alive (in accordance with her father's wish), then this, in my judgment, would require skilled nursing care during the day when she receives most of her medications and feedings. Some form of custodial supervision in the evenings and at night would also be appropriate." MetLife notified Mr. Stephens by letter dated May 2, 1995, that no benefits would be paid for Stephanie's nursing care from January 1, 1995, forward because the care was "custodial, not skilled, in nature."

Mr. Stephens filed a second-level appeal on June 15, 1995, and submitted new letters from Drs. Smith and Metcalf, along with letters from Stephanie's nursing caregivers. In a June 14, 1995, letter, Dr. Metcalf agreed with Dr. Curry that Stephanie's continued life depended on at least some skilled nursing care and wrote, "[B]oth the retention of [the] modest advances that she has experienced in the past year or so and the possibility of additional advances will be impossible without skilled nursing care." Dr. Metcalf concluded that "Ms. Stephens needs to be in a protected, predictable, loving environment. The assistance of Home Health personnel, as well as private duty nursing is the most appropriate form of treatment." As Mr. Stephens points out, all of these doctors, along with various care-giving nurses and therapists, attested to the necessity of skilled care. Yet none opined that skilled care must continue for 24 hours each day. Dr. Metcalf implied and Dr. Curry explicitly stated that, while some skilled nursing care was appropriate and round-the-clock custodial care would be desirable, 24–hour skilled care was not medically necessary. On July 26, 1995, MetraHealth, which had replaced MetLife as network manager, denied the second-level appeal. MetraHealth's Dr. Ken Robbins advised that, "[a]fter careful review of the medical documentation submitted, The Claims Administrator has determined that 24–hour nursing services are custodial and not medically necessary." Robbins explained, "Gastric tube feedings or medications given through the gastric tube is not skilled level of care. Custodial care is being given. Therefore, no benefits are available under the plan."

On September 7, 1995, Mr. Stephens filed his third-level and final appeal with the Westinghouse Plan Administrator, resubmitting all letters associated with the second-level appeal and adding the opinion of Stephanie's state mental health board case manager, Lynda Wallace, M.A., that Stephanie's improvements were directly attributable to the level of care provided. Upon receipt of the appeal, Betty Trocchio, Senior Benefits Services Consultant for Westinghouse, asked a company named CORE to perform a three-physician panel review of Stephanie's case. Mr. Stephens points to several alleged flaws in the October 20, 1995, panel report, including lack of biographical data concerning the reviewing physicians, lack of the physicians'

script signatures, the brevity of the report, collaboration by the physicians rather than independent deliberation, reliance on certain statements by Dr. Metcalf that contradict his June 14, 1995, letter, lack of reference to Dr. Curry's report, and an apparent inconsistency in one of the physician's comments. Mr. Stephens levels these charges, of course, because all three members of the panel concluded that Stephanie had reached a point of maximum recovery and could receive the care and daily services she needs from trained personnel, as opposed to skilled nurses. The board concluded that Stephanie did not need skilled nursing care and that the care being provided was custodial. Thereafter, Trocchio advised Mr. Stephens that his third and final appeal had been denied and that the Plan would provide no reimbursement for skilled nursing care.

As with all covered medical expenses, the Plan covers the services of registered nurses and licensed practical nurses only if medically necessary. The Plan explains that "[m]edically necessary shall be determined in the sole discretion of the Claims Administrator and is defined as services and supplies that are: 1) consistent with the symptoms, diagnosis and treatment of your illness or injury; 2) given to you as an in-patient only when the services cannot be safely provided as an out-patient; 3) in accordance with standards of good medical practice; and 4) not provided solely for the convenience of your doctor, hospital, other provider, or you." The Plan states, however, that regardless of medical necessity, "[b]enefits are not available for custodial care . . . ." The Plan itself does not define that term. Instead the Westinghouse Benefits Plan summary plan description booklet defines "custodial care" as "[c]are rendered to a patient who is disabled mentally or physically, and such disability is expected to continue and be prolonged; who requires a protected, monitored and controlled environment whether in an institution or in the home; who requires assistance to support the essentials of daily living; and who is not under active and specific medical/surgical or psychiatric treatment that will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored or controlled environment. . . . [A] custodial-care determination is not precluded because the ordered and prescribed services and supplies are being provided by a registered nurse, licensed practical nurse, or licensed vocational nurse."

The "Plan Administrator and those persons acting on its behalf are vested with full power and sole discretion to interpret all terms of the Plan. This includes, but is not limited to, applying the Plan terms to facts involving those covered by the Plan . . . and making credibility findings and interpreting all facts involved in administering the Plan. The intent of this [provision] is to provide the Plan Administrator and those acting on its behalf with the sole and final authority to exercise the fullest scope of discretion with respect to all matters . . . including . . . coverage, level of benefits, eligibility and all facts that are involved in any fashion with the Plan . . . ."

After Westinghouse denied his third-level appeal, Mr. Stephens filed suit in federal district court seeking damages and a declaration that the Plan covers the 24-hour care provided to Stephanie. *See* 29 U.S.C. § 1132(a)(1)(B). In reviewing the Administrator's decision, the district court applied the "arbitrary and capricious" standard. It found that Trocchio was authorized by the Plan to conduct the third-level appeal. The court noted the inherent conflict of interest associated with Westinghouse both funding and managing the Plan but refused to scrutinize the denial of benefits in the absence of significant evidence of self-interest or bad faith. Al-

## 482

though not exactly content with the result, the court declined to "second-guess the administrator's decision because it was based on the evidence that Stephanie's condition has changed from when skilled care was needed in 1992.... As the court [could not] say that Defendant's decision was unreasonable, the decision to deny benefits" was affirmed.

## II

As in all other cases, this court reviews the district court's findings of fact for clear error but gives de novo consideration to questions of law. When a benefit plan gives the Plan Administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's benefit determination is reviewed for abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.1997). Where, as here, the plan gives the administrator broad discretion, reviewing courts apply the arbitrary and capricious standard to a denial of benefits. *See Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir.1996). Under this deferential standard, a court will uphold a benefit determination if it is "rational in light of the plan's provisions." *University Hosps. v. Emerson Elec. Co.,* 202 F.3d 839, 846 (6th Cir.2000) (citing *Yeager,* 88 F.3d at 381). "Stated differently, 'when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Ibid.* While the review undertaken here mandates consideration of the administrator's self-interest, *cf. Bruch,* 489 U.S. at 115, this court has expressly rejected the notion that the conflict of interest inherent in a self-funded and -administered plan alters the standard of review. Instead, that fact should be taken into account as a factor in determining arbitrariness or capriciousness. *See Peruzzi v. Summa Medical Plan,* 137 F.3d 431, 435 (6th Cir.1998).

In hopes of proving an administrative irregularity sufficient to undermine the court's confidence in the decision to deny benefits, *see Buttram v. Central States, S.E. & S.W. Areas Health & Welfare Fund,* 76 F.3d 896, 899–900 (8th Cir.1996) (endorsing heightened review when a beneficiary shows that a serious irregularity existed, which caused a serious breach of the plan trustee's fiduciary duty to the beneficiary), Mr. Stephens assigns error to the district court's finding that Betty Trocchio was authorized to handle the third-level appeal. The Plan states that a "final request for a review of the denied health care claim shall be made in writing to the Plan Administrator .... The Plan Administrator ... will review the application for benefits ...." Westinghouse Electric Corporation is the Plan Administrator. While the Plan vested in the "Plan Administrator and those persons acting on its behalf," full discretion in reviewing benefits claims, the Plan did not identify "those persons." This fact leads Mr. Stephens to analyze an unrelated provision of the Plan regarding named fiduciaries. That provision specifies that Westinghouse "shall be the Named Fiduciary to the Plan. The Managers, as appointed by the Company to be the named fiduciaries [serving as financial managers and administrative managers] have the authority to control and manage the operation and administration of the Plan." The Plan notes that the "Managers may employ one or more persons to render advice with regard to any responsibility such fiduciary has under the Plan." According to Mr. Stephens, Managers may not delegate their responsibility to review third level appeals to mere employees. Instead, Stephens argues, employees like

Betty Trocchio, a senior benefits consultant in Westinghouse's Employee Service Center, can do no more than render advice to the Managers.

This analysis of the Plan's provision governing named financial and administrative fiduciaries is irrelevant to the provision that governs this case. Contrary to Mr. Stephen's concept of administrative managers, the "Managers" who receive advice from employees, as described in the "named fiduciaries" paragraph, have no authority to review third-level appeals under the terms of the Plan—only the Plan Administrator does. The "Managers," as named fiduciaries under 29 U.S.C. § 1102(a)(2), have certain responsibilities relating to the financial health and administrative management of the Plan. The "Plan Administrator" is a separate office with distinct responsibilities. Compare 29 U.S.C. § 1002(16)(A)(ii) (defining "administrator"), with 29 U.S.C. § 1002(21)(A) (defining "fiduciary"). The Plan Administrator has duties and obligations imposed by provisions of ERISA apart from the fiduciary provisions, including: preparing financial reports for filing with the DOL, see 29 U.S.C. § 1021(b), providing participants with copies of plan documents, plan summaries, and other prescribed information, see 29 U.S.C. § 1021(a), and providing participants with information regarding their benefits, see 29 U.S.C. § 1025.

Moreover, the Plan provision granting full discretionary authority to the "Plan Administrator and those persons acting on its behalf" is quite distinct from the "named fiduciaries" provision cited by Mr. Stephens. Compare JA at 182 (discussing named fiduciaries), with JA at 193 (granting the Plan Administrator discretion). This case turns on the Administrator's discretion, and the paragraph creating that discretion expressly confers it on both the Administrator—who happens, in this case, to be a corporation that can only work through its agents—and the broad category of "those persons acting on its behalf." Neither ERISA law nor the Plan itself reveals a connection between the discretion-creating paragraph and the provision that appoints "Managers" as named fiduciaries and recites that they can receive advice from employees. Mr. Stephens thus has given us no reason to conclude that Betty Trocchio's handling of the third-level appeal constituted a "serious irregularity," Buttram, 76 F.3d at 900, that undermines confidence in the result. Indeed, the Plan expressly authorized Westinghouse to engage employees to act on its behalf in these matters, as it did when it asked Trocchio to handle the third-level appeal.

Mr. Stephens argues that the district court improperly ignored significant evidence of self-interest or bad faith on the part of Westinghouse. He identifies several facts allegedly indicative of bad faith: 1) a letter from MetLife to Westinghouse in March 1995 discussing the cost of Stephanie's care and suggesting Medicare as an alternative payor; 2) an April 1995 note by Dr. Bryson stating that a nursing home would be a less costly alternative setting; 3) Dr. Bryson's May 1995 denial of the first-level appeal in disregard of the opinions of Drs. Metcalf, Smith, Marrero, and Curry; 4) the July 1995 denial of the second level-appeal, in disregard of additional letters from Drs. Smith and Metcalf and Dr. Curry's report; 5) Betty Trocchio's October 1995 denial of the third-level appeal, which disregarded Dr. Metcalf's June 1995 letter and Dr. Curry's report and instead "relied on the bought and paid for telefax from CORE."

█ Although a plan administrator's file will rarely contain evidence of a decision made on the basis of cost or otherwise in bad faith, a plaintiff may show that admin-

istrators failed to use their judgment by coming forward with "material, probative circumstantial evidence that [leaves] the court with serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Buttram*, 76 F.3d at 900. None of the evidence described by the plaintiff raises serious doubts as to the exercise of the administrator's judgment, especially in light of the fact that none of the disregarded letters and reports reached the conclusion that 24–hour–per–day skilled nursing care was medically necessary. For example, Mr. Stephens's repeated references to Dr. Curry's independent medical examination implies that it constitutes evidence of the medical necessity of 24–hour skilled nursing care. Quite to the contrary, Dr. Curry concluded that keeping Stephanie alive "would require skilled nursing care *during the day* when she receives most of her medications and feedings. Some form of *custodial supervision in the evenings and at night* would also be appropriate."

Mr. Stephens attacked the CORE case report as "inherently lacking in both credibility and reliability." The technical faults he identifies (*e.g.*, lack of an actual signature, absence of resumes of the physicians, lack of proof that the physicians received the documents they claimed to rely on) go, at most, to the weight rather than the competence of the report. Nothing on the face of the report identifies it as somehow "inherently" flawed. To the contrary, the report's contents reveal a familiarity with Stephanie's condition, progress, treatment, prognosis, and continuing needs. Trocchio's conduct of the third-level appeal, *including* her reliance on the CORE report was neither arbitrary nor capricious.

█ Mr. Stephens describes as arbitrary and capricious Westinghouse's decision to make its denial of benefits pursuant to the review commenced on March 3, 1995, retroactive to January 1, 1995. Through late February 1995, Stephanie had accumulated more than $25,000 in unpaid skilled nursing bills, a figure that doubled by the time Westinghouse formally denied benefits on May 2, 1995. While Mr. Stephens's arguments call upon the equitable powers of this court, we cannot overturn the Plan Administrator's decision in the absence of evidence that it results from the arbitrary or capricious exercise of discretion. Since none of the medical evaluations drafted in connection with the March–May 1995 benefits review concluded that 24–hour nursing care was a medical necessity, and Mr. Stephens has pointed to no evidence showing that such care was a medical necessity as of January 1, 1995, we cannot conclude that the Administrator overstepped the bounds of its discretion. Stephens points to no Plan provision that limits retroactive denial of benefits. We note, by way of comparison, that the Plan made its July 1992 decision to pay benefits retroactive by a full year.

Mr. Stephens objects to Westinghouse's reliance on the definition of custodial care appearing in its Summary Plan Description (SPD). He charges the Administrator with "substituting the definition of custodial care in the summary booklet for that of medically necessary in the Plan document" and insists that the skilled care provided to Stephanie falls within the Plan document's definition of "medically necessary." Mr. Stephens argument contains a flaw in its premise. Although the SPD specifies that "[i]f there are any differences between this booklet and the Plan document the Plan document will govern," the definitions at issue do not conflict. Under the Plan, covered medical expenses include only medically necessary care *of certain types,* and the expansive definition of "medically

necessary" marks the absolute limits of the Plan's scope of coverage. The Plan expressly excludes coverage for certain forms of treatment even when medically necessary and counts among these exclusions "custodial care." In the absence of the elaborate definition in the booklet, the Plan Administrator would have broad discretion to interpret the term "custodial care" and apply it to various claims. *See Peruzzi*, 137 F.3d at 433 (reviewing denial of coverage based on an exclusion of treatments that "are experimental or of a research nature"). The SPD booklet simply refines the Plan's definition of "custodial care" by creating prerequisites and an exception to the term's application. The SPD booklet does not conflict with the Plan definition of "medically necessary" because the Plan document itself provides that benefits will not issue for custodial care even when medically necessary, and the SPD booklet merely defines "custodial care."

The first three elements of the SPD definition establish the circumstantial prerequisites for the applicability of the custodial care exclusion: care is custodial if rendered to a patient 1) suffering a physical or mental disability that is expected to continue for a prolonged period, 2) requiring a protected, monitored, and controlled environment, and 3) requiring assistance to support the essentials of daily living. The fourth element carves out an exception to the exclusion in recognition of the beneficial effects of certain medically necessary treatments delivered to severely disabled patients: care given to a patient who meets all three of the above conditions is not considered custodial if the patient is "under active and specific medical/surgical or psychiatric treatment that will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored, or controlled environment." Thus, care provided by profes-

sional nurses to support or generally maintain a patient's condition will be considered custodial, if such services do not advance an achievable goal of allowing the patient to function outside of the protected environment, i.e. achieving independence from the skilled care.

▮ Mr. Stephens has not cited any authority in support of his assertion that ERISA plans must, as a matter of public policy, pay for ˌskilled care when, without it, the patient's condition will deteriorate and the patient will die. As the Eighth Circuit recognized, a Plan Administrator's decision to deny benefits to a patient suffering a prolonged disability without expectation of meaningful recovery based on a custodial care exclusion similar to Westinghouse's does not conflict with the public policy of ERISA. *See Buttram*, 76 F.3d at 902. Nothing in ERISA compels coverage of medically necessary but custodial care, and Westinghouse has not agreed to provide it.

Mr. Stephens asserts that the fourth element of the custodial care exclusion's definition is arbitrary and capricious in light of its "vague and ambiguous" terms. This court reviews not whether definitions are arbitrary—they always are—but whether the decision to deny benefits was arbitrary or capricious. *Peruzzi* recognized the propriety of administrators interpreting terms not defined in the plan document and reviewed the denial of benefits under the arbitrary and capricious standard. *See Peruzzi*, 137 F.3d at 433.

Finally, Mr. Stephens argues that the "overwhelming credible evidence" "supports his contention that Stephanie requires skilled nursing care and has recently made significant functional gains." Dr. Metcalf endorsed continued skilled care primarily because of the G-tube and the administration of certain medications. Dr.

Smith concurred, additionally mentioning avoidance of seizures and bladder and oropharyngeal infections. Dr. Curry agreed with Dr. Metcalf's assessment and advocated skilled nursing care *during the day*. The three physicians who composed the CORE report, in contrast, all opined that maintenance of the G-tube and delivery of medications could be handled by trained professionals, as distinguished from skilled nurses. Likewise, MetraHealth's Dr. Robbins stated that "[g]astric tube feedings or medications given through the gastric tube is not skilled level of care." MetLife's Dr. Bryson concluded that the care given was designed to maintain basic life functions rather than oversee medical procedures that require monitoring by skilled nurses. Most importantly, none of these opinions called for the level of care, 24–hour skilled nursing care, given to Stephanie and claimed by Mr. Stephens as medically necessary. Furthermore, despite the doubts Mr. Stephens raised about the quality of the CORE report, it contains sufficient indicia of reliability—in the form of the reviewers' familiarity with the patient's history, needs, and prognosis, along with obvious examination of the record and purported contact with treating physicians—that we cannot overlook it. We cannot require the Plan Administrator to ignore it either. Accordingly, the reports before the Plan Administrator when Trocchio denied the claim lent substantial support to the conclusion that 24–hour skilled nursing care is not medically necessary, and not a single report in the record undermined that conclusion.

Even if 24–hour skilled nursing care were medically necessary, Westinghouse properly denied the claim because the evidence showed that the care being given was custodial. As Mr. Stephens admitted, the three circumstantial prerequisites all applied to Stephanie. Although the evidence shows that Stephanie had made sig-

nificant improvements between 1991 and 1995, including functional gains in motor skills, communication skills, bladder control, eating, and simple decision-making, the record's strongest statement of foreseeable future improvement does not indicate a belief that Stephanie will be able to leave her "protected, monitored, or controlled environment." Dr. Smith's May 1995 letter concludes, "It is hoped that through these efforts, including physical therapy, medication monitoring, individual training and motivation, and appropriate surgical corrective procedures when they apply, Stephanie will be able to reduce her present limitations and disability so that she may regain more of her independence, and reach the highest functional state possible."

The CORE report reflects a less hopeful outlook. Dr. Winkler, a neurologist, reported Dr. Metcalf's comments that "[t]he patient has reached a medical end result and has ceased improving." Dr. Pierson, also a neurologist, concluded that "[t]he patient has reached maximal neurologic recovery some time ago. The chances of significant functional change at this point out from [sic] her injury are non-existent." Dr. Gilliar, a specialist in physical and rehabilitative medicine, recounted Dr. Metcalf's March 1995 conclusion "that the patient's status 'has not changed. She still remains in a neuro-vegetative state and is completely dependent upon around the clock care for fundamental supportive measures and specific medical treatment, such as G-tube care, catheter care, giving medications on a timely basis.'" Dr. Gilliar additionally opined that "[h]er ultimate level of functioning may be improved in certain limited aspects but not as much as to enter another level of functioning." All three CORE report authors concurred in their conclusions: "none of the daily services being received by the patient require

the participation of a licensed professional;" "there are no skilled nursing needs;" and the "patient does not require 24 hour skilled nursing. The patient is at a custodial level of care. The medical necessity for continuation of such supervised skilled care is not indicated, as the patient is medically stable and the services provided can be administered by trained personnel, which does not have to be at a skilled level." With so much record evidence supporting the belief that Stephanie would not improve to reach a higher level of functioning, the Plan Administrator's decision to deny benefits for 24–hour skilled nursing care as custodial care was "rational in light of the plan's provisions." *University Hosps.*, 202 F.3d at 846. Because "it is possible to offer a reasoned explanation, based on the evidence, for" the Administrator's decision, *ibid.*, this court will not interfere in its exercise of the discretion granted by the Plan.

### III

Substantial evidence supported Westinghouse's dual conclusion that 24–hour skilled care was not medically necessary and that it was custodial, either of which would sustain the decision to deny benefits for 24–hour skilled nursing care. Although the Plan Administrator is not bound by statements at oral argument, in explaining Westinghouse's interpretation of the Plan document, counsel for the defendants recognized that patients receiving custodial care for a long-term disability could apply separately for benefits to treat acute illnesses. Additionally, while Mr. Stephens has not yet filed an application for partial or lower-level benefits, *e.g.*, for 6 hours per day of skilled care, counsel for the defendants left open the possibility that, if such were medically necessary and not custodial, benefits would be available. However, those matters are not before us now. Accordingly, we AFFIRM the district court's judgment affirming Westinghouse's denial of benefits for 24–hour skilled nursing care.