William PEACH, Plaintiff,

v.

**ULTRAMAR DIAMOND SHAMROCK** and Ultramar Diamond Shamrock Employee Benefits Review Committee, Defendants.

No. 01–10095–BC.

United States District Court, E.D. Michigan, Northern Division.

Oct. 24, 2002.

Mandel I. Allweil, Van Benschoten, Hurlburt, Saginaw, MI, for Plaintiff.

Charles S. Mishkind, Miller, Canfield, Grand Rapids, MI, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO AFFIRM ADMINISTRATIVE DECISION AND DENYING PLAINTIFF'S MOTION TO REVERSE ADMINISTRATIVE DECISION

LAWSON, District Judge.

The plaintiff, William Peach, was employed by Total Petroleum, Incorporated (TPI) when the company was acquired by defendant Ultramar Diamond Shamrock (Diamond). Peach continued to work for Diamond as part of a transition team, understanding that his term was finite, but having been promised certain severance benefits if he stayed on and fulfilled certain conditions. Within two months of his departure date, Peach was instructed to travel to Texas to train Diamond employees there for an extended period of time. Peach refused, and his employment was terminated. He applied for severance benefits, but the Ultramar Diamond Shamrock Employee Benefits Review Committee (EBRC) determined that Peach had not fulfilled the required conditions and denied benefits. Peach filed a complaint in this Court contending that he was wrongfully denied benefits under the TPI transition plan adopted by Diamond, which is an employee welfare plan as defined by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. (ERISA). The parties filed cross motions on the administrative record, and the Court heard argument on October 16, 2002. The Court finds that the plaintiff wrongfully refused a job assignment given by Diamond, that due to the plaintiff's resulting departure from employment he did not fulfill the conditions precedent to awarding benefits under the transition plan, and that the EBRC's decision not to award severance benefits was not arbitrary and capricious. The Court further finds that the plaintiff is not entitled to relief on his common-law or equitable claims. The defendants' motion to affirm the administrative decision therefore will be granted and the plaintiff's motion to reverse will be denied.

### I.

The crux of the dispute in this case is whether the plaintiff's assignment to travel to San Antonio, Texas to train Diamond employees constituted a "relocation" which, under the terms of the TPI Change in Control Severance Plan for Employees (the Plan), gave the plaintiff "good reason" to refuse. Peach contends that he was ordered to relocate his principal duty location to Texas, giving him reason to leave without jeopardizing his eligibility for severance benefits. Diamond insists that the Plan barred only actual "relocation," not "travel," and that Peach's refusal to travel to San Antonio constituted a breach of Plan terms that forfeited his right to a severance package.

The plaintiff was employed by TPI as a manager in its Alma, Michigan accounting office. He had joined TPI's predecessor, Leonard Refineries, in 1969. Administrative Record (AR) at A031, ¶ 3. Although Peach had no college education, he had risen through the ranks to manage the retail accounting department and was in charge of various tax and accounting functions. Id. ¶ 4.

On April 15, 1997, defendant Diamond announced its intention to acquire TPI. The deal was subject to due diligence and regulatory approvals. TPI's employees were notified that the consolidation would mean that some employees would lose their jobs, others would be offered positions with Diamond after the acquisition,

others would be discharged within 60 days of the closing of the transaction, and still others would be assigned to transition teams and their employment would end when the transition ended.

To retain key employees while the acquisition was being effectuated, TPI established the TPI Change in Control Severance Plan for Employees. The Plan provided severance benefits to employees ("participants," according to the Plan) who met the Plan's requirements for eligibility. Specifically, the Plan states:

Article II, Section 2.1: *Eligibility for Benefits.* If a Change in Control occurs prior to a Participant's termination of employment with the Control Group, then upon the termination of the Participant's employment with the Control Group by the Employer without Cause or by the Participant for Good Reason during the period running from the date of the Change in Control to one (1) year after the date of such Change in Control, then, subject to Section 2.6 below, the Participant shall be entitled to a Severance Benefit and the additional benefits described in this Article II. Notwithstanding the above, a Participant shall not be considered to have been terminated without Cause if his or her position is eliminated, but he or she is offered Comparable Employment, as described in Section 1.14. A participant shall not be entitled to a Severance Benefit or any additional benefits described in this Article II if the Participant's employment is terminated (i) by the Employer for Cause, (ii) by the Participant without Good Reason or (iii) on account of death, disability (as defined in Section 22(e)(3) of the Code) or retirement (without Good Reason).

AR at A007.

Thus, a participant is not eligible for benefits under the Plan if his employment is terminated (1) by the employer for cause, (2) by the participant without good reason, or (3) on account of death, disability, or retirement without good reason. The Plan defines "cause" and "good reason" as follows:

Article I, Section 1.4: "Cause" shall mean (with regard to a Participant's termination of employment with the Control Group): (A) gross negligence or willful misconduct by the Participant with regard to the Company, or its assets; (B) misappropriation or fraud with regard to the Company or its assets (other than good faith expense account disputes); (C) conviction of, or the pleading guilty or *nolo contendere* to, a felony (other than a traffic violation); or (D) violation of the Company's established policies, but only if such violation would have historically resulted in a termination for "cause" of a similarly situated Participant. A termination for Cause shall mean a termination by the Company effected by written notice given within ninety (90) days of the occurrence of the Cause event.

. . .

Article I, Section 1.14: "Good Reason" shall mean (with respect to a Participant's termination of employment with the Control Group) the occurrence or failure to cause the occurrence of any of the following events without the Participant's express written consent: (A) a reduction in the Participant's annual base salary or annual potential bonus relative to the prior year's potential bonus; (B) a relocation of the Participant's principal business location to an area outside a forty (40) mile radius of the Participant's current principal business location; or (C) a failure of any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) of the Company to assume in writing the obligations hereunder. Notwithstanding the foregoing, if as a result

of a Change in Control, the Participant's position is transferred to another location or is eliminated, Good Reason shall not occur if the Participant rejects an offer of Comparable Employment (as defined below) by the Control Group. For this purpose, Comparable Employment means a position that has the same or higher Base Salary, and has duties that do not result in the material reduction of the Participant's accountability or responsibility relative to the Participant's accountability or responsibility prior to a Change in Control, provided such position does not require the Participant to relocate his or her principal business location to an area outside a forty (40) mile radius of the Participant's current principal business location. . . . A termination for Good Reason shall mean a termination by the Participant effected by written notice given within ninety (90) days after the occurrence of the Good Reason.

*Id.* at A005, A006.

The Plan is an employee welfare benefit plan under 29 U.S.C. § 1002(1). Benefits are paid from the general assets of Diamond, AR at A002, and included severance pay, health and life insurance, job placement assistance, and extra pension contributions. AR at A032, A026.

In October 1997, the plaintiff was assigned to a transition team, and was informed in March 1998 by letter that his termination date would be September 30, 1998. All other employees of TPI were terminated by the end of May 1998. Between March 31, 1998 and April 29, 1998, two San Antonio employees of Diamond came to Michigan to be trained by Peach. Peach also states that in January 1998, Claudine Ton Nu, a manager at Diamond, offered him a position in San Antonio, which he declined. Ton Nu allegedly said at that time, "I guess you can't be bought." Diamond admits that the topic came up

between the two, but denies that any formal offer was made.

Sometime around July 29, 1998, Chuck Weber, another Diamond supervisor, called Peach and informed him that it would be necessary for him to travel to San Antonio in connection with his transition work. AR at A034 ¶ 27, A060, A067–68. Weber claimed that the reason for the visit to Texas would be to train employees in Michigan taxation. *Id.* at A034 ¶ 28. Peach was asked to continue that travel schedule until his scheduled date of termination on September 30, 1998. Peach responded that he would not travel to San Antonio and explained that his job had never required travel before. Peach also stated that he had personal obligations in Alma, including his role as financial officer of the local United Way chapter and deacon and financial officer of his church, that precluded any lengthy period of time away from Alma. *Id.* at A035 ¶ 32. Peach also complained that the trip to San Antonio would make it difficult for him to find a new job. *Id.* Peach states that he promptly called supervisors Ruth Pina and Kirk Williams in San Antonio, both of whom told him that the Plan required no such obligation. *Id.* at A035 ¶ 30, calendar A060, notes A068 (Pina); *Id.* at A035 ¶ 31, calendar A060 (Williams).

On August 3, 1998, Peach tried to reach Ruth Pina, but was told she was out of the office and that he should contact either Karen Pina or Susan Lawrence. *Id.* at A035 ¶ 35. Lawrence called back on August 5, 1998 and told Peach that if the company wished him to come to San Antonio, he had no choice but to do that. *Id.* at A036 ¶ 38. Peach protested again to both Weber and Lawrence on August 6, 1998, arguing that the Plan clearly did not require any travel on his part, that he had held up his part of the bargain, and that Diamond was acting improperly. *Id.* ¶ 39.

Lawrence responded by offering to fly Peach into San Antonio on Monday mornings and back to Michigan on Friday mornings. Peach, however, still refused to leave Alma, and claims that the trip "was not part of the agreement, not part of the transition, and at this point I had already more than performed what was the original six-month agreement." *Id.* The following day, Lawrence informed Peach that failure to travel to San Antonio would result in forfeiture of his Plan benefits. *Id.* ¶ 40. On August 10, 1998, Ruth Pina affirmed this position, telling Peach that part of his job was to travel to San Antonio and train employees, and that his failure to appear would compromise his Plan benefits. *Id.* ¶¶ 41–42. Pina also claimed that if Peach's work was completed earlier, he could return home before September 30, 1998. *Id.* ¶ 43.

On August 11, 1998, Peach called Chuck Weber and informed him that he did not want to travel, he would not travel, he was not required to travel as part of the agreement, and if he had known travel was required, he never would have stayed on. *Id.* ¶ 45. Claudine Ton Nu reiterated the loss of benefits threat later that same day. *Id.* ¶ 47. The next day, Ruth Pina issued a memorandum notifying Peach that he was to report for work in San Antonio on August 17, 1998. He was advised that his refusal to work would be deemed a resignation from employment. *Id.* at A037–38 ¶ 49. On August 13, 1998, a company representative named Steve Price appeared at the plaintiff's house, demanded his office keys and calculator, and delivered the Pina memorandum to Peach. *Id.* at A038 ¶ 54.

Peach did not report for work on August 17, 1998 in San Antonio or thereafter.

Peach's next contact with Diamond occurred on February 17, 1999, when his attorney tendered a request for benefits under the Plan. Ms. Penny Viteo, the Diamond head of Human Resources, denied the request on May 7, 1999. The plaintiff timely requested a review of this decision by the Employee Benefits Review Committee by letter of July 1, 1999. A hearing was held on June 28, 2000. After considering 227 pages of evidence and a 32–page post-hearing brief submitted by the plaintiff, the EBRC affirmed the denial of severance benefits. Decision, *id.* at A296.

The plaintiff now challenges the denial of benefits pursuant to Section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Court has reviewed the administrative record and now determines the parties' motions based on that record.

## II.

█ The parties agree that the standard of review in this case is the arbitrary and capricious standard. This deferential review is appropriate when the ERISA plan at issue provides a clear grant of discretion to the plan administrator and the decision being appealed was made in compliance with plan procedures. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595, 597 (6th Cir.2001). When applying this standard, the Court must determine whether the administrator's decision was reasonable in light of the available evidence. Put another way, if there is a reasonable explanation for the administrator's decision in light of the plan's provisions, then the decision was not arbitrary and capricious. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000). In the absence of a designated procedural challenge, no evidence outside of the administrative record may be con-

sidered. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir.1998).

In this case, the plaintiff argues that conflicts of interest exist which affect the fairness of the administrative review process, requiring the Court to temper its deference to the Plan administrator's decision on review. Specifically, the plaintiff contends that payments under the Plan come from Diamond's general funds, not a defined plan fund, motivating the employer to favor decisions denying benefit payments. He also notes that the Plan administrator, Penny Viteo, also approved Peach's termination. She did recuse herself from the EBRC's deliberations, but also appeared before the Committee that she herself administered to make the company's case for affirming her decision. Finally, another EBRC member, Thomas O'Brien, was the individual who originally told TPI employees that they would not be released, and then changed his mind and informed them that nearly all of them would be released by May 1998.

 The presence of a conflict of interest does not require relaxation of the deferential arbitrary and capricious review standard or mandate *de novo* review of the plan administrator's decision. *Marchetti v. Sun Life Assur. Co. of Canada,* 30 F.Supp.2d 1001, 1007 (M.D.Tenn.1998). Rather, the conflict of interest is a factor taken into account when evaluating the decision under the arbitrary and capricious standard. *Id.; see also University Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846 (6th Cir.2000). The mere existence of a structural conflict of interest is not enough to justify heightened scrutiny of the plan administrator's decision. The plaintiff must provide actual evidence that the conflict of interest had some effect on the administrator's decision. *See Peruzzi v. Summa Med. Plan,* 137 F.3d 431, 433 (6th Cir.1998). No such evidence was presented in this case. Although it is true

that Peach's Plan payout would have come from Diamond's general funds, the defendants assert, and the plaintiff has not contested, that Plan payments were *de minimis* when compared to the overall costs of acquiring TPI. No statement in the record suggests that Diamond's dissatisfaction with Peach had anything to do with the size or nature of his severance package. Furthermore, there is nothing wrong with Ms. Viteo, the plan administrator, explaining the justification for her denial of the plaintiff's benefits to the EBRC. Presumably, the Committee wished to hear both sides of the argument. Viteo did recuse herself from the review decision itself, and no taint arises solely because of her advocacy on behalf of the company's original position. Finally, the plaintiff's assertion that Chuck Weber may have been seeking to cover up his "misleading" representations regarding the duration of the transition phase is speculation unsupported by the record.

 The plaintiff also argues that the Plan contains several ambiguous terms, and that those terms must be construed against the company's position and in favor of the employee. It is true that courts apply common-law rules of contract construction when construing ERISA plan language. *See Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 556, 557 n. 7 (6th Cir. 1998). Further, the Sixth Circuit, in *University Hospitals,* a case utilizing the arbitrary and capricious review standard, did note in passing that the rule of *contra proferentem* was applicable in the ERISA context. 202 F.3d at 846–47. The *University Hospitals* court, however, never actually applied that rule in that case; the statement was *obiter dictum,* not establishing binding precedent. *See Ohio Co. v. Nemecek,* 98 F.3d 234, 238 (6th Cir.1996) (noting that subsequent panels are not bound by previous panel's recognition of a

possible exception to a rule when that exception was not at issue in that case). Further, although the application of the *contra proferentem* rule of construction may be quite appropriate under a *de novo* standard of review, *see Sieggreen v. Unum,* No. 00–10417–BC, 2002 WL 31357045 (E.D.Mich. Sept. 17, 2002), it is inconsistent with a deferential review standard under which the plan administrator is given wide latitude to interpret plan language. *See Admin. Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson,* 164 F.3d 981, 986 (6th Cir.1999); *Moos v. Square D Co.,* 72 F.3d 39, 42 (6th Cir.1995) ("[P]lan administrators who are vested with discretion in determining eligibility for benefits [have] great leeway in interpreting ambiguous terms."). Moreover, every Circuit which has directly considered the issue has held that *contra proferentem* does not apply in the context of the deferential review standard. *See Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1100–01 (10th Cir.1999) (collecting cases). The Seventh Circuit succinctly reconciled these conflicting principles in *Morton v. Smith,* 91 F.3d 867 (7th Cir.1996), as follows:

> The federal common law of ERISA does provide that ambiguous terms in benefit plans should be construed in favor of beneficiaries. *Phillips v. Lincoln Nat'l Life Ins. Co.,* 978 F.2d 302, 311 (7th Cir.1992). But this rule has no application here. Often called the rule of *contra proferentem,* it is a device for determining the intended meaning of a contract term in the absence of conclusive evidence about intent. *See Winters v. Costco Wholesale Corp.,* 49 F.3d 550, 554 (9th Cir.1995). Courts invoke this rule when they have the authority to construe the terms of a plan, but this authority arises only when the administrators of the plan lack the discretion to construe it themselves. *See Firestone,* 489 U.S. at 110–15, 109 S.Ct. at 954–57.

Therefore, it is only used when courts undertake a *de novo* review of plan interpretations. *See Phillips,* 978 F.2d at 311–12; *see also Winters,* 49 F.3d at 554. When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no occasion to employ the rule of *contra proferentem.* Deferential review does not involve a construction of the terms of the plan; it involves a more abstract inquiry—the construction of someone else's construction. Because this case engages us in this more abstract exercise, we will not apply the rule.

91 F.3d at 871 n. 1. This Court likewise concludes that *contra proferentem* is not a rule of construction that is applicable to ERISA plans which are reviewed under an arbitrary and capricious standard, as in this case.

### A.

Turning to the merits of the dispute, Peach contends that Diamond's conclusion that he resigned from his job is not supported by substantial evidence in the administrative record. Rather, he contends that he was fired. This is significant, he argues, because under the Plan, Diamond could only fire Peach "for cause," and then was bound by certain notice requirements which Peach claims were not fulfilled. In its written decision, the EBRC "concluded that Mr. Peach quit his employment by not reporting for work after August 12, 1998 and that there was not Good Reason under the Plan for his voluntary termination." AR at A297. The Committee also noted, however, that if it had not reached that conclusion, it would have found that Peach's refusal of the job assignment

would have constituted cause for his termination. *Id.* n. 2.

There is no dispute as to what actually happened here. Diamond wanted Peach to train workers in San Antonio, and told him that is what he had to do to continue working there. Peach said, in effect, that he wanted to continue working for Diamond, but on his terms, that is, doing his regular work at his office in Alma, Michigan. No accommodation was reached and Peach stopped working for Diamond. Because Diamond continued to hold out an offer for Peach to work—in San Antonio—Diamond contends that Peach's refusal to take them up on it constituted a voluntary quit. Peach argues that he was ready, willing and able to continue working—in Alma—and that the company's refusal to allow him to do that constituted a firing.

The determination of whether an employee quit or was fired often comes up in the context of unemployment benefit disputes. For instance, in *Potris v. Commissioner of the Department of Employment & Training*, 42 Mass.App.Ct. 735, 679 N.E.2d 605 (1997), the plaintiff refused to continue working after transfer to a division in which the presence of certain chemicals caused her concern for her health. The court reversed the decision that the plaintiff had "quit" because of inadequate proof that her departure from work was "both (1) voluntary *and* (2) without good cause attributable to the employing unit." *Id.* at 608. The court postulated that "a person who is forced to leave work because of compelling personal circumstances has left work involuntarily," and that if the plaintiff's employer had required her to "perform work that was clearly antithetical to that for which she was initially employed" she could terminate employment without disqualification from benefits. *Id.* Similarly, in *Peck v. Employment Appeal Bd.*, 492 N.W.2d 438 (Iowa Ct.App.1992), the court determined that a worker who

left work early because of dissatisfaction with job assignments and was later told not to report back the following day did not "quit." The court held that "a voluntary quit means discontinuing the employment because the employee no longer desires to remain in the relationship of an employee with the employer" requiring proof of "an intention to terminate the employment relationship accompanied by an overt act carrying out the intent." *Id.* at 440. In *Bertini v. Administrator, Unemployment Compensation Act*, 39 Conn. Supp. 328, 464 A.2d 867 (1983), an employer terminated a worker for accepting additional part-time work from a competitor in violation of a company work rule. The employer argued that the doctrine of "constructive quit" applied, precluding an award of unemployment benefits. That doctrine "allows one to infer or to presume from the voluntary actions of an employee that he caused a circumstance which he knew or should have known would result in his being discharged from his employment." *Id.* at 869. The court rejected that argument because the state benefits statute did not recognize it, and because the plaintiff, despite his violation of the work rule, "continued to be present and qualified for his duties." *Id.* at 870. The court determined that the plaintiff was fired.

On the other hand, in *Yardville Supply Co. v. Board of Review, Department of Labor*, 114 N.J. 371, 554 A.2d 1337 (1989), the court held that an employee who had been hired as a truck driver, and who subsequently lost his driver's license as a result of a drunk driving conviction causing the employer to terminate him, voluntarily quit his job. The court established the following rule: "Where it is reasonably foreseeable that an employee's voluntary conduct will render him unemployable, and his actions actually do lead to the loss of a prerequisite of employment, the employee

leaves work voluntarily without good cause attributable to such work." *Id.* at 1340 This rule was recognized by the California Court of Appeals in *Steinberg v. California Unemployment Insurance Appeals Board,* 87 Cal.App.3d 582, 151 Cal.Rptr. 133 (1978), where the court said:

> A claimant is said to have voluntarily quit his job when, although discharged by the employer, the claimant himself set in motion the chain of events which resulted in the employer's having no choice except to terminate him. All three of the following elements must be present before it can be said that a claimant has constructively quit his job. [1] The claimant voluntarily committed an act which [2] made it impossible for the employer to utilize his services, and [3] the claimant knew or reasonably should have known the act would jeopardize his job and possibly result in the loss of his employment.

*Id.* at 134–35 (citation and emphasis omitted). The commentators suggest that the states are split on whether to accept the doctrine of constructive leaving. *See* 76 Am.Jur.2d *Unemployment Compensation* § 107 (1992); 81 C.J.S. *Social Security* § 225b (1977 & Supp.2002).

■ Under the facts of this case, the Court would be inclined to conclude that Peach was fired. Diamond gave him a work assignment requiring Peach to travel to another city during the week, and Peach refused to do it, although he was ready to perform in Alma. Diamond did not accept that condition and terminated Peach; a company employee came to Peach's home on August 13, 1998 and took his Alma office keys and calculator. Peach then attempted to use "Dialogue" to resolve the impasse, but the company did not respond to Peach's overtures, suggesting that it was the company which severed the relationship.

But it was not unreasonable for the EBRC to conclude otherwise. There are facts in the administrative record which support a finding that Peach's decision not to report to work in San Antonio was voluntary on his part, that it was impossible for Diamond to use his services elsewhere, and that Peach had ample warning that his conduct would result in the loss of his job. Even after Peach's office keys were taken from him, the company held out an offer for Peach to continue working there. It was Peach who chose not to do so. This conclusion is reasonable in light of the available evidence and the manner in which various courts have addressed the legal issue presented by the facts. In other words, it was not unreasonable for the EBRC to apply the doctrine of voluntary leaving, which was within the range of legal theories applied by courts across the country; and that doctrine also was applicable to the facts disclosed by the administrative record. No more is required under the arbitrary and capricious standard. *See Williams,* 227 F.3d at 712. The EBRC's conclusion that Peach voluntarily quit his job therefore will be affirmed.

### B.

■ Regardless of the label placed on Peach's separation, the pivotal question in this case is whether it was reasonable for the Plan administrator to conclude that the assignment to train workers in San Antonio, Texas did not constitute the "reloca[tion of Peach's] principal business location" under the terms of the Plan. *See* AR at A006. If this decision cannot withstand scrutiny under the arbitrary and capricious standard, then Peach's refusal to report for work in San Antonio constituted "good reason" for him to quit, and likewise would not support a decision to terminate him for cause.

At oral argument, both parties agreed that the difference between "travel" and "relocation" in the context of this case is one of degree. There will come a point in time when travel to the same location from another city, day after day, becomes a *de facto* relocation. Weekly travel for parts of five days for six weeks, however, will not establish "relocation" as a matter of law. The EBRC's conclusion that Peach was not being asked to "relocate" was reasonable. Although the EBRC itself did not define what amount of travel would constitute a "relocation," it did find that "weekly travel and overnight stays for a limited time" was not a relocation of one's principal place of business, especially given that Peach would retain at least a nominal office in Alma. Although a six- to eight-week stay in a location over a thousand miles away might reasonably be considered a "relocation," a requirement of weekly travel that begins on Monday and ends on Friday morning can be distinguished, and the EBRC reasonably did so. The plaintiff failed to demonstrate that the proposed travel schedule would actually interfere with his religious and charitable obligations. In fact, his principal reason for refusing the assignment to travel was "[b]ecause I don't want to." AR at A074.

Peach argues that the six-week assignment could have evolved into a longer one, as demonstrated by statements in the administrative record suggesting that the company was contemplating extending Peach's San Antonio stay. *See* AR at A066 (notes of Peach indicating that Chuck Weber had suggested that Diamond may seek to "extend [Peach's] contract beyond September"). However, the applicable Plan provision does not allow the company to extend the "travel" indefinitely without Peach's express written consent. *See* Plan, art. I, § 1.14, AR at A006. Peach also argues that if travel to San Antonio did not constitute relocation, the company could have simply offered Peach a job

there and forced him to stay. However, that argument ignores the established termination date of September 30, 1998. In addition, if that date were changed, it could constitute evidence that the temporary travel was evolving into a relocation. But since neither of those contingencies occurred, it is not necessary to assess their impact on the EBRC's decision.

Because the EBRC reasonably concluded that the assignment to train workers in San Antonio for six weeks, with company-paid transportation to and from each week, did not constitute "relocation," the Committee's determination that Peach had no "Good Reason" to quit was likewise reasonable. It would have been equally reasonable to conclude that there was "Cause" to terminate Peach for his refusal to report for work as directed. *See* Plan, art. I, § 1.4, at A005 (defining "cause," as, among other things, "willful misconduct"). Under the deferential standard of review applicable in this case, the decision of the Plan administrator must be affirmed.

III.

■ The plaintiff has also included in his complaint allegations of breach of fiduciary duty and estoppel. He claims that promises of inflated amounts of pension mitigation benefits were made to induce him to stay through the transition, and that he performed a substantial portion of his contract. He also argues that there is no equitable basis for Diamond to withhold benefits from him, and to do so constitutes unjust enrichment. The defendants contend that these claims are preempted by ERISA.

ERISA preempts state law and state law claims that "relate to" any employee benefit plan as that term is defined therein. 29 U.S.C. § 1144(a); *Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272, 1275 (6th Cir.1991). The phrase

"state law" in turn is "defined using equally broad language, to include 'all laws, decisions, rules, regulations, or other State action having the effect of law.'" *Zuniga v. Blue Cross & Blue Shield of Mich.*, 52 F.3d 1395, 1401 (6th Cir.1995) (citing 29 U.S.C. § 1144(c)(1)). However, ERISA does not preempt an action "too tenuous, remote or peripheral to warrant a finding that the action 'relates to' the plan." *Lion's Volunteer Blind Indus., Inc. v. Automated Group Admin.*, 195 F.3d 803, 807 (6th Cir.1999) (citations omitted). "It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Cromwell*, 944 F.2d at 1276.

In *Cromwell*, a health care provider brought suit against the administrator of an employee benefit plan in state court alleging breach of contract, promissory estoppel, negligence, and breach of good faith. *Id.* at 1275. After the defendant removed the claim, the district court dismissed the plaintiff's state-law claims as preempted by ERISA. *Id.* On appeal, the Sixth Circuit found that the thrust of the plaintiff's state-law claims, despite their titles, was the recovery of benefits from the plan for health care services. *Id.* at 1276. As a result, the plaintiff's claims were plainly preempted by ERISA, and the district court was affirmed. *Id.*

The Sixth Circuit again took up the issue of preemption in *Lion's Volunteer Blind*. In that case, an employer and beneficiary sued a welfare benefit plan, alleging that the plan denied coverage after previously assuring the employer and beneficiary to the contrary. 195 F.3d at 805. The district court ruled that the plaintiffs' misrepresentation claim was not preempted by ERISA because the alleged misconduct occurred prior to the plaintiffs' participation in the plan. *Id.* at 806. On interlocutory review, the Sixth Circuit re-versed. The crucial issue was not when the alleged misconduct occurred, but rather its effect on the ability of ERISA to provide the remedy the plaintiffs seek. *Id.* at 808. Citing *Cromwell*, the Court then looked to the substance of the plaintiffs' claims, rather than their labels, and found that a court entertaining the plaintiffs' misrepresentation claim would be required to calculate the benefits due and owing to the plaintiffs. *Id.* at 809. As such, the plaintiff's claim was a request for benefits, and thus was preempted. Id.

▪ Although a claim based on estoppel may be associated with a request for benefits, this theory is nonetheless available under federal common law if the following conditions are met: (1) the plan at issue is a welfare plan, not a pension plan; (2) the plan provisions are ambiguous with respect to the coverage issue the plaintiff presents; and (3) the traditional components of estoppel (either promissory or equitable) are present. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 403 & n. 13 (6th Cir.1998) (en banc); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1299–1300 (6th Cir.1991). The components of estoppel are as follows:

1. conduct or language amounting to a representation of material fact;

2. awareness of the true facts by the party to be estopped;

3. an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;

4. unawareness of the true facts by the party asserting the estoppel; and

5. detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Armistead,* 944 F.2d at 1298. However, the Sixth Circuit has also held that a benefits recipient cannot reasonably rely on oral representations contrary to unambiguous plan terms. *See Sprague,* 133 F.3d at 404.

An unjust enrichment claim seeking the disbursement of benefits is preempted because it is, in essence, one for benefits that "relates to" the Plan, and it does not fall under the rubric of "other appropriate equitable relief" which ERISA allows. 29 U.S.C. § 1132(a)(3)(B). Claims for benefits may not be disguised as claims under the federal common law or other provisions of ERISA. If the plaintiff seeks a payment of benefits, then his sole remedy is under 29 U.S.C. § 1132(a)(1)(B). *See Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 91–92 (6th Cir.1997) (refusing to permit the plaintiff to recast his unexhausted claim for benefits as one for statutory breach of fiduciary duty and common law unjust enrichment). The same rule applies to *quantum meruit* claims. *See Tappe v. Alliance Capital Mgmt. L.P.,* 177 F.Supp.2d 176, 186–88 (S.D.N.Y.2001) (recognizing availability of *quantum meruit* for unpaid salary and bonuses, but rejecting an attempt to use a theory of implied contract to recover benefits denied under an ERISA severance plan).

The plaintiff has provided no basis in this case for equitable relief. His estoppel claim seems to have two components: first, Peach alleges that he was originally promised a termination date of the end of May 1998 and that Diamond subsequently reneged on that agreement. There is no support for this contention in the record. Peach's "expectation" of separation before the end of May allegedly arose from a group meeting held in October 1997 in which even Peach admits Mr. O'Brien said only that *essentially* all employees would be terminated by the end of May. *See* AR at A031, ¶ 7. Furthermore, it was clear that each employee would eventually receive specific written notice of his or her termination date. The second issue, concerning the amount of the pension mitigation contribution owed to Peach, is moot since Peach does not prevail on his claim for benefits. No connection is provided between a possible dispute over the *amount* of benefits provided and Peach's *decision* to participate in the transition. At best, the record indicates that this was a collateral issue that would likely have been resolved only after Peach became entitled to the severance benefits.

The unjust enrichment and *quantum meruit* claims, as well as the breach of fiduciary duty claim, are merely a recharacterization of the claim for benefits. They are barred by the preemptive effect of ERISA's legislative scheme. *Cromwell,* 944 F.2d at 1276.

For the same reason, the plaintiff may not simply recharacterize his claim for benefits as one for "restitution." Restitution has both legal and equitable aspects, and unless the plaintiff seeks to impose an equitable lien or a constructive trust, his claim amounts to no more than a request for "legal" relief available only through § 1132(a)(1)(B). *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 714, 151 L.Ed.2d 635 (2002); *see also id.* at 713 ("A claim for money due and owing under a contract is quintessentially an action at law." (internal citation omitted)).

█ No relief is available on the basis of substantial performance. First, it is unclear whether such an action survives ERISA. But since it is essentially an action for benefits, preemption is likely. *See Lion's Volunteer Blind,* 195 F.3d at 809. Further, even if the action were permitted, it would have to be based on the common law of contracts. *See Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 92 (6th Cir.1997). Although the doctrine of sub-

stantial performance does provide relief for plaintiffs in certain contractual disputes, it applies only when (1) the breach is not material and (2) the contract does not explicitly require the obligation that was breached. *See Restatement (Second) of Contracts* § 237 cmt. d (1981). Here, Peach's termination letter from Diamond specifies a termination date of September 30, 1998. The Plan specifies, in essence, that Peach must work until his termination date. Working through that date is a material requirement, given the purpose of the Plan to retain workers who know their days with the new company are otherwise numbered. Thus, the failure to fulfill that condition precludes an award on the basis of substantial performance.

The Court finds that Peach may not recover on his common-law and equitable claims.

### IV.

The Court has determined that the decision of the Plan administrator was reasonable in light of the evidence contained in the administrative record. Further, the plaintiff is not entitled to relief on any of his common-law or equitable counts.

Accordingly, it is ORDERED that the defendants' motion to affirm the administrative decision [dkt # 13] is GRANTED, and the plaintiff's motion to reverse [dkt # 18] is DENIED.

It is further ORDERED that the plaintiff's complaint is DISMISSED WITH PREJUDICE.

It is further ORDERED that the defendants' motion to strike the plaintiff's procedural challenges [dkt # 19] is DENIED for the reasons stated on the record on October 16, 2002.