**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0083n.06**
**Filed: February 3, 2005**

**No. 03-2270**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ALEKSANDR RASKIN, | ) | |
| | ) | |
| *Plaintiff-Appellee,* | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| UNUM PROVIDENT CORP., and THE PAUL | ) | District of Michigan |
| REVERE LIFE INS. CO., | ) | |
| | ) | |
| *Defendants-Appellants.* | ) | |

**Before:**      **BOGGS, Chief Judge; CLAY, Circuit Judge; and WALTER, District Judge.**[*]

**BOGGS, Chief Judge.**  Defendants appeal from the district court's order granting disability benefits to plaintiff.  The companies paid benefits to plaintiff before discontinuing the benefits following an investigation.  The district court ruled that the termination of benefits had been arbitrary and capricious.  We disagree and conclude that the decision by defendants to discontinue plaintiff's benefits was not arbitrary and capricious.  Because the defendants offered a reasoned explanation based on the available evidence, we now reverse.

**I**

---

[*]The Honorable Donald E. Walter,  United States District Judge for the Western District of Louisiana, sitting by designation.

No. 03-2270
Raskin v. Unum Provident Corp.

In 1996, Aleksandr Raskin was working as a software developer for Engineering Technology Associates, which had purchased disability insurance for its employees from defendant Paul Revere Life Insurance Company ("Paul Revere"), which is a subsidiary of defendant UNUM. The policy under which Raskin was insured defines disability as follows:

> TOTAL DISABILITY or TOTALLY DISABLED FROM THE EMPLOYEE'S OWN OCCUPATION means that until he reaches the end of his Maximum Benefit Period, the Employee:
>
> 1. is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy;
>
> 2. does not work at all; and
>
> 3. is under Doctor's Care.

J.A. 57. In late 1996, Raskin developed leukemia. In November of that year, he underwent surgery for a bone marrow transplant related to that disease. Because of complications resulting from that operation, he successfully filed for benefits in January 1997. In the years that followed, Raskin, whose eyesight was already compromised because a childhood injury left him blind in his left eye, developed chronic graft-versus-host disease resulting in inflammation and dryness of the eyes. He also developed a cataract in his right eye, for which he underwent surgery in June 2000.

Dr. Ila Shah-Reddy took over primary care for Raskin in May 2000. In September 2000, Judy Ellington, R.N., an employee of Paul Revere, interviewed Dr. Shah-Reddy about Raskin's condition and ability to return to work. Ellington prepared a memorandum summarizing their conversation, which included comments from Dr. Shah-Reddy that Raskin could return to work part-time and progress to full time without any restrictions or limitations. Dr. Shah-Reddy also

recommended the insurance company contact Dr. Tobias George, Raskin's treating ophthalmologist.

Paul Revere faxed Dr. George, who had performed Raskin's cataract surgery, a letter asking for Raskin's medical records and asking if his ophthalmological conditions limited his ability to return to work. On January 16, 2001, Dr. George faxed them a one-sentence note stating that Raskin was able to return to his previous job. That same day, Paul Revere wrote Raskin informing him that it was terminating his benefits.

On February 14, 2001, Raskin filed an administrative appeal, in which he included a letter from Dr. Shah-Reddy. Dr. Shah-Reddy now claimed that Raskin could not return to work until September 2001 at the earliest. She noted that Ellington, Paul Revere's interviewer, never asked whether Raskin could return to work specifically as a computer programmer. Also, she noted Ellington's failure to mention that should Raskin lose his disability payments, he would not be able to afford his medications. This created a conflict in the medical opinions, with Dr. George advocating a return to work and Dr. Shah-Reddy recommending against one. Defendants responded by having Dr. P. F. McSharry review the file. Dr. McSharry concluded that, based on the record before him, defendants should defer to Dr. George's opinion and therefore deny Raskin further benefits. On February 14, 2001, Paul Revere did uphold its original decision.

On March 5, 2001, Raskin again contested the decision, including a letter from Dr. N. Elyas. Pursuant to this appeal, Dr. George wrote another letter to defendants' consultant, informing her of the cataract surgery in June 2000 that successfully repaired Raskin's visual acuity. He noted, however, that Raskin still had other problems, specifically his eye dryness, that limited his abilities to perform his previous job as a computer programmer. Dr. George now found "it very doubtful that

[Raskin] could return to work in his present condition . . . ." J.A. 41. Dr. George also recommended that should Raskin return to work in the future, he be given a rest for ten minutes of every hour. Dr. Shah-Reddy reiterated her opinion that Raskin was unable to work. Her letter of March 16, 2001 noted that Raskin had graft-versus-host disease; that he was on expensive medications; and, that his return to working as a software developer was complicated by his cataract. Dr. McSharry again reviewed the file. This time, he concluded that while Dr. George determined Raskin could return to work, he could not disagree with Dr. Shah-Reddy's conclusions. Following this opinion, Paul Revere asked Dr. Shah-Reddy to list Raskin's specific restrictions and limitations. In May, Dr. Shah-Reddy replied with a letter that restated her earlier claims. On May 30, Dr. Joseph Uberti, who had supervised Raskin's bone marrow transplant in 1996, wrote a letter confirming that Raskin still had eye dryness that would make it difficult for him to work.

Paul Revere then asked a case manager, Pat Branham, to review the file. Branham concluded that Dr. Shah-Reddy's change in position was without justification. Branham took particular note of Dr. Shah-Reddy's lack of evidence for her change of opinion and her failure to provide specific restrictions and limitations. Paul Revere also asked another ophthalmologist, Dr. John E. Miller, to examine the medical records. Dr. Miller concluded that Raskin could return to work, based on his improved visual acuity. He counseled that the use of extra eye lubricant and rest periods would make Raskin better able to perform as a computer programmer. On July 12, 2001, Paul Revere sent its final decision to Raskin, affirming the denial of benefits and explaining the basis for its decision.

Raskin subsequently sued defendants in state court. Defendants removed the case on the grounds that Raskin's claims were pre-empted by the Employee Retirement Income Security Act

of 1974, 29 U.S.C. §§ 1001–1461 (ERISA). On July 10, 2003, the district court heard arguments based on the administrative record and thereafter granted Raskin's motion seeking ERISA benefits. It entered an order to that effect on August 26, 2003. Defendants timely appeal, arguing that the decision to deny benefits was not arbitrary and capricious.

**II**

We review the decision of a district court in an ERISA benefits case *de novo*. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002). If a benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, this court examines the denial of benefits under the "arbitrary and capricious" standard of review. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710-11 (6th Cir. 2000) (*citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-12, 115 (1989)). Because Paul Revere had such authority under the plan, we inquire as to whether its denial of benefits to Raskin was arbitrary and capricious. This standard is the most deferential form of judicial review of administrative actions. *See id.* at 712. Under arbitrary and capricious review, this court "must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, *when it is possible to offer a reasoned explanation,* based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Ibid.* (emphasis added, quotation marks and internal citations omitted).

The policy under which Raskin received benefits allowed Paul Revere both to determine eligibility for benefits and to pay benefits to individual recipients. This arrangement could create

the potential for a conflict of interest, as the same group that bears the cost also determines the amount of cost by deciding who receives benefits. We have noted that the possibility of a conflict of interest should be considered as a factor in determining whether the denial of benefits was arbitrary or capricious. *See Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000).

Even considering that factor, we cannot say that Paul Revere's denial of Raskin's benefits was arbitrary and capricious. Drs. Shah-Reddy and George both initially reported that Raskin could return to work without any restrictions or limitations. Only after learning that their patient's benefits were being discontinued did the doctors change their opinions. Moreover, while Dr. George expressed significant doubts about Raskin's ability to return to work after his initial positive opinion, he did not foreclose the possibility. Dr. George advised that if Raskin returned to work in the future, he should receive hourly breaks. Such a situation, where Raskin took rests throughout the day, is consistent with denying benefits under the terms of the policy, which preclude awarding benefits if the insured is able to work part-time. Even assuming that Dr. George joined Dr. Shah-Reddy in disapproving of Raskin's return to work as a computer programmer, this court has cautioned against giving significant weight to a doctor's supplemental opinion when that opinion follows the patient's denial of benefits and is issued without any justification for the change. *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 171 (6th Cir. 2003). Dr. Shah-Reddy offers only one possibly valid explanation for her change of opinion: that Paul Revere's interviewer, Ellington, did not ask specifically if Raskin could return to work as a computer programmer. But that explanation is insufficient, given her blanket approval of Raskin returning to work without any restrictions or

limitations and Dr. George's specific statement that Raskin could return to his previous job. Furthermore, Dr. Shah-Reddy's additional explanation that the interviewer failed to alert her to the fact that Raskin would no longer receive his medication reveals the possibility of an improper motive for her change of opinion.

Paul Revere also had grounds for finding Dr. Shah-Reddy's opinion deficient. She did not provide any new clinical data to support her change of opinion. *See ibid.* Despite being asked by Paul Revere to do so, Dr. Shah-Reddy never provided specific restrictions or limitations affecting Raskin's ability to return to work. While she stated Raskin was on medication, she never indicated that it would interfere with his ability to perform his job. If she had said so, she would have contradicted her initial interview, in which she stated that Raskin was on medication but maintained that he could return to work without limitations. Dr. Shah-Reddy pointed out that the medication Raskin took was expensive, which again reveals a possible inappropriate motivation. Moreover, a crucial part of her opinion was incorrect. She stated that Raskin could not return to work as a computer programmer because he had a cataract; but that cataract had been successfully removed by Dr. George almost a year before Dr. Shah-Reddy's letter.

In addition, Paul Revere had the opinions of Drs. McSharry and Miller. Dr. McSharry initially determined that Paul Revere should deny benefits. Though he later changed his mind, he did so based on Dr. Shah-Reddy's subsequent reports that Paul Revere already had reason to discount. Paul Revere also relied on the opinion of Dr. Miller, an ophthalmologist, who reviewed Raskin's file. Dr. Miller concluded that Raskin could return to work and offered specific steps to assist him in returning.

Paul Revere can therefore present a reasoned explanation for its denial of benefits. *See Williams*, 227 F.3d at 712. It relied on the opinion of Drs. Miller and George in preference to the opinions of Drs. Shah-Reddy and Uberti. *See McDonald*, 347 F.3d at 169 (stating that when a plan administrator chooses to rely on the medical opinion of one doctor over another, that decision is rarely arbitrary and capricious). Paul Revere had good reasons to discount Dr. Shah-Reddy's second recommendation, as she did not offer any valid reason for her change of opinion. She failed to provide clear restrictions and limitations on Raskin's ability to return to work or any new data on which to rest her new recommendation. *See id.* at 171. Of course, denying Raskin benefits is not the only possible reasoned explanation to draw from the evidence in this record. But our review of Paul Revere's action is not to identify if it is the only, or even the best, resolution. We simply ask whether it is possible for Paul Revere to offer a reasoned explanation for its denial. *See Williams*, 227 F.3d at 712. On these facts and given this court's precedents, Paul Revere offered such an explanation.

Appellee's arguments to the contrary are unconvincing. Raskin relies heavily on our decision in *Spangler*, 356 F.3d at 359-62. In that case, the defendant withheld parts of the plaintiff's file from the vocational consultant, in the hope of receiving a favorable result. *See id.* at 362 (concluding that defendant had "cherry-picked" the file to obtain a particular outcome). Raskin concedes that Paul Revere never engaged in any such behavior during its investigation. Instead he submits that defendant acted similarly in only choosing to credit medical opinions in its favor. This argument misstates the company's actions. Rather than simply choosing the favorable evidence, Paul Revere asked experts, such as Drs. McSharry and Miller, to weigh the competing evaluations.

Extending *Spangler* to the situation before us now would make any denial of benefits arbitrary and capricious when there are competing medical opinions. But that is exactly contrary to the meaning of arbitrary and capricious review. *See McDonald*, 347 F.3d at 169.

Our conclusion is not affected by Raskin having been awarded disability benefits from the Social Security Administration. Raskin's successful pursuit of those benefits is not contained in the administrative record, which is the only evidence that we review. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998) (*citing Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 437 (6th Cir. 1997)). Moreover, as the Supreme Court recently made clear in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), benefits determinations under the Social Security Administration follow a different set of procedures than ERISA claims because the procedures are designed to meet the need of efficiently and uniformly administering a large system. *See id.* at 832-33.[1] Therefore, even if the Social Security Administration's determination were properly before us, it would not necessarily change the outcome of this case.

For all these reasons, we cannot say that Paul Revere's denial of benefits was arbitrary and capricious. Because we conclude that it is possible for defendant to offer a reasoned explanation of its decision, we REVERSE the judgment of the district court.

---

[1]In *Nord*, the Supreme Court ruled that the treating physician rule could not be imported to review of ERISA determinations. *Id.* at 834. Raskin's reliance on that rule to justify the district court's award of benefits is therefore foreclosed.

No. 03-2270
Raskin v. Unum Provident Corp.

**CLAY, Circuit Judge, dissenting.**  The defendants in this case moved from one doctor to the next in their quest for an opinion that would "support" their desire to terminate Raskin's benefits. They had no luck with any of the doctors who actually examined Raskin, who insisted he was unable to return to work, or with the first doctor they contracted to review his medical file, who agreed with Raskin's doctors' assessment. When, at last, Dr. Miller reviewed Raskin's file on Defendants' behalf and concluded that he was able to return to work, Defendants seized upon that opinion, scarcely pausing to notice that it was obviously reached without the benefit of critical information.  Because the opinion of one under-informed physician who did not have an opportunity to actually examine Plaintiff cannot reasonably prevail over the opposing views of several doctors, including some who had actually examined Plaintiff and one who was hired by Defendants, I dissent from the majority's view that Defendants offered a reasoned explanation for their decision to terminate Raskin's benefits.

The majority is correct that our review here is under the arbitrary and capricious standard, "the most deferential form of judicial review of administrative actions."  However, this standard does not convert this Court into a "rubber stamp" of the benefits plan administrator.  *Jones v. Metropolitan Life Ins. Co*, 385 F.3d 654, 661 (6th Cir. 2004), citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003).  "Deferential review is not no review, and deference need not be abject."  *McDonald*, 347 F.3d at 172 (citations and internal quotation marks omitted). We remain obligated to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues."  *Id.*

I turn, then, to the line-up of medical opinions in this case. At the time of Raskin's second appeal, Paul Revere had evidence that the following doctors believed Raskin was unable to return to his job as a computer programmer: his primary-care physician, Dr. Shah-Reddy; his opthalmologist, Dr. George; Dr. Uberti, who supervised Raskin's bone marrow transplant; and Dr. McSharry, who was hired by Defendants to review Raskin's file. Each of these doctors supported their opinions with objective medical facts. Nonetheless, the majority weakly attempts to discredit all of their opinions. I am unpersuaded by these efforts, for reasons I will turn to shortly.

On the other side, only Dr. Miller, who never examined Raskin but was asked by Paul Revere to review his medical file after all of the doctors just discussed opined that Raskin could not return to his job[2], was of the view that Raskin could return to work. In a circumstance conveniently ignored by the majority opinion, Dr. Miller mistakenly believed that he was *agreeing* with Dr. George, the treating opthalmologist, in recommending that Raskin return to his job. Apparently, Dr. Miller had not been provided for review Dr. George's letter setting forth Dr. George's revised opinion. Ironically, Dr. Miller cautioned that Dr. George should be consulted again before Raskin was required to return to work. Of course, unbeknownst to Dr. Miller, Dr. George *had* been

---

[2]I am, of course, aware that the Supreme Court has held that plan administrators are not required to grant special deference to treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). However, in *Black & Decker*, the plaintiff was referred to a doctor by the insurance carrier, who then examined plaintiff and came to a different conclusion than his own doctor. I submit that under the unique factual circumstances of a case like this, where every doctor who examined Raskin concluded that he was not able to return to work, those opinions are entitled to more weight than the sole opinion of a doctor who never saw the plaintiff and relied upon incorrect information in forming his opinion. *See Giroux v. Fortis Benefits Ins. Co.*, ___ F.Supp. 2d ___, 2005 WL 58140, *6 (D.Me. Jan. 11, 2005).

consulted again, and had advised that Raskin was unable to perform his job as a computer programmer.

As the majority concedes, there is one more factor weighing in the balance in this case: Paul Revere's conflict of interest in this case, as the party bearing responsibility both for deciding eligibility benefits and for paying benefits to those eligible, must be weighed in determining whether the denial of benefits was arbitrary and capricious. *See Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). In short, Paul Revere's self-interested decision to terminate Raskin's benefits was supported only by the opinion of a doctor hired by Paul Revere, who had never examined Raskin, who mistakenly believed that Raskin's opthalmologist had authorized his return to work, and who conditioned his recommendation on the advice of Raskin's opthalmologist, who, when asked, opined that Raskin could not return to work. In contrast, Paul Revere's decision ignored the opinions of all four of the other doctors offering opinions in this case. Under the circumstances, I fail to see how Paul Revere's explanation for its termination of Raskin's benefits can fairly be considered "reasoned."

The majority attempts to bolster Paul Revere's decision by attacking the doctors who regarded Raskin as unable to work. I will briefly respond to these attacks, which are thoroughly unpersuasive. First, the majority makes much of the fact that Dr. George and Dr. Shah-Reddy initially offered cursory opinions that Raskin could return to work. Dr. Shah-Reddy explained that Judy Ellington, the Paul Revere employee who had contacted Dr. Shah-Reddy for her original opinion, failed to explain to her that Raskin worked as a computer programmer. Dr. Shah-Reddy explained that Raskin suffered from low-grade graft versus host disease, and that this illness had

decreased his eyesight and caused tremendous eye dryness, making it impossible to work as a computer programmer.  Of course, Raskin's position was highly relevant because under the terms of the insurance policy provided by Paul Revere, a "total disability" means, in relevant part,  that the insured employee "is unable to perform the important duties of *his own occupation*" (emphasis added).

Dr. George, whose initial opinion was announced in a terse one-line fax ("[t]he above patient is able to return to his previous job"), also reversed his position, explaining in a letter that Raskin had severe keratitis sicca, brought on by his bone marrow transplant and making it "difficult for him to keep his eyes open for any extended period of time, even with the use of artificial tears. Therefore, I find it very doubtful that he could return to work in his present condition."  In comparison to Dr. George's first unexplained and unsupported one-sentence assertion that Raskin could return to work, this subsequent letter reflects a thoughtful medical opinion based on objective facts.

Nonetheless, the majority takes great offense at the doctors' revised opinions, contending that in *McDonald*, "this court . . . cautioned against giving significant weight to a doctor's supplemental opinion when that opinion follows the patient's denial of benefits and is issued without any justification for the change."  This language implies that the doctor who offered the supplemental opinion in *McDonald,* Dr. Clary, did so to help the plaintiff challenge a denial of benefits, when in fact Dr. Clary was the only doctor whose opinion supported the plan administrator's decision to terminate benefits. The factual circumstances of that case are quite distinct from the facts here: after several other doctors disagreed with Dr. Clary, the plan

administrator's chief legal counsel, director of benefits, and nurse coordinator conducted a telephone conversation with Dr. Clary in which they urged him to "clarify" his original report, which was already fairly detailed. For example, Dr. Clary's report discussed the results of a psychological test performed on McDonald, made several diagnoses and concluded with a paragraph-long discussion of how McDonald would fare in a work setting. *McDonald*, 347 F.3d at 164. Nevertheless, following his conversation with the representatives of the plan administrator, Dr. Clary submitted a "supplemental report" in which he "was much more forceful in his conclusion that McDonald was able to engage in gainful employment." *McDonald*, 347 F.3d at 171. Furthermore, this Court had an additional reason to discount Dr. Clary's opinion: his "absurd" conclusion that McDonald's "vigorous pursuit of disability claim would argue against disability for severe depression." *Id.* at 172.

In contrast, in this case, both Drs. Shah-Reddy and Dr. George originally offered very perfunctory assessments that Raskin could return to work, but, on further reflection, revised those opinions and presented compelling medical arguments in support of their revised opinions. Under these circumstances, I do not believe that *McDonald* authorizes Paul Revere to ignore the revised, and much more thoughtful and informed, opinions of Drs. Shah-Reddy and George.

The majority also charges that Dr. George "did not foreclose the possibility" that Raskin could return to work, but, in suggesting that if Raskin returned to work he should receive hourly breaks, actually presented a position consistent with denying benefits because the terms of the policy preclude providing benefits if the insured is able to work part-time. The majority's argument misleadingly implies that Dr. George stated that Raskin could return to work if he was given hourly

breaks. In fact, Dr. George's view was that it was "very doubtful" that Raskin could return to work, but that if a determination was made to the contrary, he should be given hourly breaks. In other words, Dr. George was not of the view that under a set of certain conditions Raskin could return to work; instead, he made it clear that he had grave doubts about Raskin's ability to return to work, whatever the conditions. The fact that he suggested an accommodation of Raskin's disability in the event that his opinion was rejected demonstrates his concern for his patient, which should not now be used to cast doubt on the firmness of Dr. George's opinion that Raskin could not return to work.

Finally, the majority opinion unfairly impugns the integrity of Dr. Shah-Reddy without any basis for doing so. The majority suggests that Dr. Shah-Reddy's statement in her letter explaining her change of opinion based upon Ellington's failure to inform her that Raskin would no longer receive his medication "reveals the possibility of an improper motive." Quite to the contrary, Dr. Shah-Reddy made it abundantly clear that Raskin needed his medicine in order to function; therefore, it was medically appropriate for her to conclude that without his medicine, he would not be able to work.

It is remarkable that the majority is so willing to malign the substantial evidence supporting the view that Raskin was unable to return to work, and yet is untroubled by the fact that the only evidence on the other side, Dr. Miller's letter, is rendered wholly unreliable by the fact that it was offered based on Dr. Miller's review of an incomplete file. The majority's decision rewards Paul Revere's transparent effort to find any doctor, however ill-informed, to support its decision to terminate Raskin's benefits. I therefore respectfully dissent.